628 A.2d 735

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. STEVEN ANTHONY GALLOWAY, DEFENDANT–
APPELLANT.

Argued November 30, 1992—Decided August 2, 1993.

632

634

*Edward P. Hannigan,* Deputy Public Defender II, argued the cause for appellant (*Zulima V. Farber,* Public Defender, attorney).

*Linda A. Rinaldi,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case, defendant admits shaking a three-month-old child hard several times, thereby injuring the child and causing his eventual death. A jury found defendant guilty of murder as well as of endangering the welfare of a child. Although defendant does not deny causing the child's death, he claims that because of diminished capacity he could not form the intent necessary for the crime of murder.

On appeal, the Appellate Division found that the trial court had erroneously instructed the jury concerning the burden of proof on the diminished-capacity defense, but found that error harmless because the evidence failed to establish that defense. That determination, implicating the standards that govern the defense of diminished capacity, presents a major issue in this appeal. Addi-

tional issues raised relate to the jury instructions for murder, the admissibility of defendant's confession, and defendant's relationship with the child as it bears on the crime of endangering the welfare of a child.

I

On December 19, 1987, defendant, Steven Galloway, was at the home of his girlfriend, Diane Brazilian. At 11:40 p.m., Ms. Brazilian went out to pick up her younger sister. She left the victim, her three-month-old child, Steven, asleep in the room adjacent to where defendant was watching television. Ms. Brazilian's parents had gone upstairs to bed. At some point, the child began to cry, and defendant went over and picked up the child. Defendant stated that he fell while carrying the child, causing the child to cry harder. He admitted shaking the child hard to stop the crying. That shaking caused the child's head to bob back and forth rapidly, causing hemorrhaging of the blood vessels of the child's brain, commonly known as the "shaken baby syndrome."

When Ms. Brazilian returned a short time later, she expressed concern about the way the child was breathing. After a short time, Ms. Brazilian decided to take the child to the hospital. At the hospital, the serious nature of the child's injuries became clear. Later, Lieutenant Lewis Nappoletano and Detectives Gregory Crumine and William Magarino of the Long Branch Police Department arrived at the hospital to question the child's family. The police department had received information that a child, possibly the victim of child abuse, had suffered serious injuries and might die.

Nappoletano talked to defendant in the hospital hallway. Defendant initially told Nappoletano that the child "wasn't breathing right," that he had "had problems burping all day," and that he had "vomited." Nappoletano then orally informed defendant of his *Miranda* rights. Defendant said he understood them. After speaking further with defendant, Nappoletano asked both defendant and Ms. Brazilian to go to police headquarters. Nappoletano

explained that they did not have to comply. Nevertheless, defendant and Ms. Brazilian went to the station.

At headquarters at approximately 5:40 a.m., defendant read and signed a form waiving his *Miranda* rights. Defendant then gave a statement to police. That statement, completed at 8:00 a.m., did not mention shaking the child. Nappoletano asked defendant if he would speak to another officer, and defendant said that he would. Nappoletano asked defendant to speak with Detective Ralph De-Fillipo because Nappoletano did not believe that defendant's initial statement was entirely truthful. DeFillipo orally advised defendant of his *Miranda* rights. DeFillipo admits that during his interview he used the "theme" that defendant had to tell him what had happened to the child so the doctors could properly treat the child. DeFillipo also knew that the child had been conceived as the result of Ms. Brazilian's rape by her previous boyfriend and that defendant's anger might have been a motive to harm the child.

DeFillipo described defendant as "extremely nervous" and said that defendant had cried at times during the interview. Later, DeFillipo called Nappoletano back into the room, and defendant told Nappoletano that he had lied in his earlier account. Nappoletano describes defendant as "actually sobbing" when Nappoletano entered the room. Defendant then gave an incriminating oral account of the events surrounding the shaking of the child. At that point, Nappoletano placed defendant under arrest, informed him orally of his *Miranda* rights, and provided defendant with a written copy of his rights. Defendant signed a written waiver of his *Miranda* rights. Defendant then gave a written statement concerning the baby's injury. In that statement, defendant admitted to wanting to hurt the child and to squeezing and shaking the child very hard. Defendant reviewed the statement and signed it. The police then took defendant to the Monmouth County Correctional Facility where, the next day, defendant recounted to Thomas Fatigante, a corrections officer, that he had committed the

offense because his girlfriend had been raped and the baby was a product of the rape, and that he had always intended to do it.

Defendant was charged with murder and third-degree endangering the welfare of a child. At trial, he sought through expert witnesses to establish that his mental condition at the time warranted the defense of diminished capacity. Defendant was convicted of both charges and received a thirty-year sentence without possibility of parole for the murder conviction and a concurrent five-year sentence on the remaining charge.

On appeal, in an unreported *per curiam* opinion, the Appellate Division upheld the convictions. The Court granted defendant's petition for certification, 130 *N.J.* 13, 611 *A*.2d 651 (1992).

## II

A major issue implicating the validity of defendant's conviction involves the defense of diminished capacity. The diminished-capacity statute in effect at the time of defendant's trial, *N.J.S.A.* 2C:4–2, stated:

> Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have the state of mind which is an element of the offense. In the absence of such evidence, it may be assumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.

In *State v. Breakiron*, 108 *N.J.* 591, 532 *A*.2d 199 (1987), the Court held that although the diminished-capacity statute required the State to prove beyond a reasonable doubt that the defendant had acted with the necessary mental state despite the presence of a mental disease or defect, it also required the defendant to establish the existence of that mental disease or defect. Subsequently, in *Humanik v. Beyer*, 871 *F*.2d 432 (3d Cir.1988), *cert. denied*, 493 *U.S.* 812, 110 *S.Ct.* 57, 107 *L.Ed.*2d 25 (1990), the court held that the imposition of a burden of proof on the defendant violated a defendant's due-process rights. Our courts now adhere to that ruling, 124 *N.J.L.J.* 1562 (Dec. 28, 1989), and the conforming statutory amendment of the defense of diminished capacity.

*L.*1990, *c.* 63. Thus, the Appellate Division correctly found that the trial court's jury instruction on the burden of proof had been in error. Nevertheless, it determined that the error had been harmless because defendant had not submitted sufficient evidence to warrant a jury charge on diminished capacity.

The Appellate Division placed great emphasis on the fact that defendant's mental condition had been characterized by the expert testimony as a "personality disorder" and could not, therefore, be considered a "mental disease or defect." The Appellate Division further found that the evidence presented related only to a loss of impulse control and was not the type of mental disease that has been recognized by our law as diminishing mental capacity by affecting the cognitive faculties.

■ We disagree with both aspects of that decision. The legislative history of the Code and our subsequent decisions demonstrate that the term "mental disease or defect" does not preclude evidence of a mental condition consisting of a borderline personality disorder as such. The Court in *Breakiron* commented on the breadth of the phrase "mental disease or defect," observing that the statutory defense of diminished capacity contemplates a broad range of mental conditions that can be a basis for the defense: "The variety and forms of mental disease are legion." 108 *N.J.* at 618 n. 10, 532 *A.*2d 199.

That understanding of the defense of diminished capacity is reflected in the history of the New Jersey Code of Criminal Justice (New Jersey Code or Code), which expresses the legislative intent underlying the enactment of this defense. The New Jersey Code adopted the diminished-capacity defense of the Model Penal Code (MPC) § 4.02. Although the Code did not adopt the MPC's insanity defense, MPC § 4.01, the MPC used the terms "disease" and "defect" in describing both defenses. The explanations accompanying the MPC concerning the insanity defense thus clarify how those terms are used in the application of the diminished-capacity defense.

The Model Penal Code refrained from defining the content of the phrase "mental disease or defect." Rather, those terms are left open to accommodate developing medical understanding. *Model Penal Code* § 4.01 cmt. 4 (Official Draft 1985). The MPC Commentary also notes that most jurisdictions relying on its formulation have not provided a definition of mental disease or defect. *Id.* cmt. 5. Further, the MPC's proposed jury charge instructs that "the law does not attempt to say what failures or conditions of the mind are properly to be regarded as disease." *Id.* app. C.

In addition to the Model Penal Code, the New Jersey Code drew heavily on existing New Jersey law in adopting the diminished-capacity defense. *New Jersey Penal Code, Vol. II: Commentary: Final Report of the New Jersey Criminal Law Revision Commission*, 99. See *State v. Breakiron, supra*, 108 *N.J.* at 607, 532 *A.*2d 199. That law also demonstrates an expansive understanding of the kinds of mental deficiencies that might sustain a defense. In *State v. DiPaolo*, 34 *N.J.* 279, 295, 168 *A.*2d 401 (1961), the Court strongly approved the admission of psychiatric evidence pertaining to the defendant's mental state:

> The judiciary cannot bar evidence which rationally bears upon the factual inquiry the legislature has ordered. The capacity of an individual to premeditate, to deliberate, or to will to execute a homicidal design or any deficiency in that capacity, may bear upon the question whether he *in fact* did so act. Hence evidence of any defect, deficiency, trait, condition, or illness which rationally bears upon the question whether those mental operations did *in fact* occur must be accepted. Such evidence could be excluded only upon the thesis that it is too unreliable for the courtroom....

*See also State v. Sikora*, 44 *N.J.* 453, 210 *A.*2d 193 (1965) (following that rule but excluding psychiatric evidence that would excuse conduct of defendant as being beyond his or her control). Acknowledging those sources, the Court in *Breakiron* recognized that the Code declined to define "mental disease or defect" and, in eschewing technical definitions of mental disease or defect, intended to leave that determination to the finders of fact. 108 *N.J.* at 620, 532 *A.*2d 199.

Against that background, we conclude that the Legislature by its use of the term "mental disease or defect" did not intend to preclude evidence of a mental condition consisting of a "disorder" as such. Forms of psychopathology other than clinically-defined mental diseases or defects may affect the mental process and diminish cognitive capacity, and therefore may be regarded as a mental disease or defect in the statutory or legal sense. Ralph Slovenko, *The Meaning of Mental Illness in Criminal Responsibility*, 5 *J.Legal Med.* 1, 16 (1984).

In addition, the determination that a condition constitutes a mental disease or defect is one to be made in each case by the jury after the court has determined that the evidence of the condition in question is relevant and sufficiently accepted within the psychiatric community to be found reliable for courtroom use. As observed by the Court in *Breakiron*, to resolve, as a matter of law, the ultimate factual dispute over whether a mental condition is a "disease or defect" would involve weighing the evidence and would thereby intrude into the province of the jury. 108 *N.J.* at 620, 532 *A.*2d 199. That understanding is consistent with the decisions of other courts that have either followed or have been strongly influenced by the MPC approach. *See, e.g., United States v. Smeaton*, 762 *F.*2d 796, 798 (9th Cir.1985) (noting that conflict in psychiatrists' testimony lay in their interpretation of kinds of disorders included in term "mental disease or defect," and holding that function of jury was to resolve factual issues, including question of what constitutes mental disease or defect); *Government of Virgin Islands v. Fredericks*, 578 *F.*2d ·927, 928 (3d Cir.1978) (stating that "the decision of whether a defendant is affected by a mental disease or defect rests with the jury's evaluation of all lay and medical evidence in the case").

In keeping with the intended application of the diminished-capacity defense, we also reject the State's assertion that because the revised *Diagnostic and Statistical Manual of Mental Disorders* (DSM) gives borderline personality disorder a V–Code diagnosis, *i.e.*, a condition described as "a behavioral and psycho-

logical problem ... not attributable to a mental disorder," the evidence failed to show a mental defect or disease. We are not persuaded that the label suggested by the DSM should determine whether defendant's mental state constitutes a mental defect or disease under the diminished-capacity defense. The DSM itself cautions that

> [i]t is to be understood that inclusion here, for clinical and research purposes, of a diagnostic category ... does not imply that the condition meets legal or other nonmedical criteria for what constitutes mental disease, mental disorder, or mental disability.

[*Id.* at xxix.]

We recognized in *Breakiron* that psychiatric classifications may not precisely fit our legal concepts of criminal responsibility. 108 *N.J.* at 618 n. 10, 532 *A.*2d 199. Moreover, Dr. Chamberlain, one of defendant's experts, based his diagnosis on the unrevised version of DSM–III, which did not classify "borderline personality disorder" as a V–Code condition.

Consistent with the legislative understanding that informed the Code, our cases recognize the broad range of mental conditions that can satisfy the Code standard of "mental disease or defect." "Personality disorders" have been among those conditions that have formed the basis for a diminished-capacity defense. For example, in *State v. Moore*, 122 *N.J.* 420, 585 *A.*2d 864 (1991), defendant had killed his wife and son with a hammer. The defense expert testified that the defendant had been diagnosed as suffering from a borderline personality disorder that had caused a stress-induced psychosis. *Id.* at 437, 585 *A.*2d 864. The Court found that the evidence, including that diagnosis, was sufficient to warrant a jury instruction on the diminished-capacity defense. In *State v. Pitts*, 116 *N.J.* 580, 562 *A.*2d 1320 (1989), the Court considered whether the trial court should have charged diminished-capacity defense even in the absence of a request for such an instruction. The defendant, diagnosed with a cyclothymic personality disorder and chronic anxiety disorder, *id.* at 591, 562 *A.*2d 1320, savagely killed two people with a knife. Although the Court

found that the evidence did not establish the diminished-capacity defense, that conclusion was not based on the diagnosis of the defendant's mental condition as a "personality disorder."

The formal characterization of the defendants' mental condition was not critical to our decisions. Rather, in *Pitts* the Court focused on the causal links between the defendant's mental disorder and the symptoms of that mental state when he killed his victims. The Court determined that the defense expert's testimony had failed to link the defendant's symptoms, which consisted of rage and loss of control, with the diagnosis of a personality disorder. 116 *N.J.* at 609, 562 *A.*2d 1320.

The Court also found in *Pitts* that the evidence demonstrated only a loss of emotional control, not an impairment of the defendant's cognitive function bearing on his capacity to form the intent to commit murder. *Id.* at 610, 562 *A.*2d 1320. A similar approach was followed in *Moore,* in which the Court determined that the diminished-capacity defense was available. It noted that "as thin as the evidence was, it contained a diagnosis of a 'brief reactive psychosis' that defendant suffered at the time of the murder," and that that could be found to have impaired his cognitive function. 122 *N.J.* at 436–37, 585 *A.*2d 864. Accordingly, the Court concluded that the defendant had offered evidence from which a jury could have determined that the State had failed to prove the requisite state of mind beyond a reasonable doubt. *Id.* at 437, 585 *A.*2d 864.

The Appellate Division here determined that the expert testimony did not justify the diminished capacity defense because it did not show an actual impairment of defendant's cognitive faculties. Rather, the testimony on defendant's mental condition demonstrated that defendant had suffered a "loss of impulse control." The Appellate Division stated, "While it can be said in a general sense that loss of impulse control interferes with a person's ability to think clearly, this is not the type of mental disease or defect which has been recognized by the law as affecting cognitive faculties." In expressing that view, the court relied on and quoted

from another Appellate Division case, *State v. Carroll*, 242 *N.J.Super.* 549, 577 *A*.2d 862 (1990), *certif. denied*, 127 *N.J.* 326, 604 *A*.2d 600 (1991), which stated:

> We read *Breakiron* and *Pitts* to distinguish between a case in which there is evidence of mental disease or defect which impairs the cognition required to act knowingly, purposely or with whatever other mental state is required to commit a particular offense, thus requiring the defense of diminished capacity to be submitted to the jury, and a case in which there is evidence of a mental disease or defect which produces an emotive reaction such as rage or impassioned impulse, where a diminished capacity defense is not required to be submitted to the jury.

[*Id.* at 558, 577 *A*.2d 862.]

The Appellate Division in this case may have read the *Carroll* opinion too broadly. In *Carroll*, the defendant's impairment, aside from its characterization as a mental disease, did not prevent him from being cognizant of the fact that he was hitting his stepdaughter over the head with a scale and stabbing her in the throat with a knife or from being practically certain his actions would cause death or serious bodily injury. *Id.* at 560–61, 577 *A*.2d 862.

The Appellate Division here may also have misread *Moore* and *Pitts* in concluding that those decisions had ruled that a personality disorder as such could not constitute a mental disease or defect that can diminish mental capacity. The Court in *Moore, supra,* noted that "the *Carroll* court distinguished" those two kinds of mental defects. 122 *N.J.* at 435, 585 *A*.2d 864. Nevertheless the Court did not analyze the evidence in the record before it "in the same way as the psychiatric testimony in the *Carroll* case." *Id.* at 436, 585 *A*.2d 864. At least one expert witness in *Moore* purported to establish the presence of a mental disease in the form of a stress-induced psychosis that grew out of the borderline personality disorder, and testified, unlike the testimony presented in *Carroll,* that that mental condition had affected the defendant's cognitive faculties. *Id.* at 437, 585 *A*.2d 864. In *Pitts,* the Court did not endorse the theory that an impenetrable line exists between a mental disease affecting cognitive facilities and one affecting impulse control or emotions. Rather, it concluded that if the mental condition resulting in a rage and loss of control does *not* affect

cognitive capacity sufficient to preclude the necessary mental state, it will not constitute diminished capacity. 116 *N.J.* at 610, 562 *A*.2d 1320.

■ Our cases, therefore, are consistent with the theory that a jury instruction is warranted when defendant has presented evidence of a mental disease or defect that interferes with cognitive ability sufficient to prevent or interfere with the formation of the requisite intent or *mens rea*. We now hold that all mental deficiencies, including conditions that cause a loss of emotional control, may satisfy the diminished-capacity defense if the record shows that experts in the psychological field believe that that kind of mental deficiency can affect a person's cognitive faculties, and the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime.

■ We conclude that defendant did provide expert testimony sufficient to warrant a jury instruction on diminished capacity. Defendant's first expert witness, Dr. Slonim, a clinical psychologist, clearly stated on cross-examination that defendant suffered *not* from a loss of cognitive abilities but rather from an inability to control his conduct. Dr. Chamberlain, however, a forensic psychiatrist and Director of the Forensic Hospital for the State of New Jersey, offered evidence to support the jury charge on diminished capacity.

Dr. Chamberlain agreed with Dr. Slonim that defendant's primary diagnosis was borderline personality disorder with a secondary diagnosis of isolated explosive disorder. He stated that a person with a borderline personality disorder is very vulnerable to stress and that condition could affect cognitive functions. He explained:

> Well, the whole area of intending to do something, which an intent, at least in my understanding of it, means the rational cognitive ability to formulate a plan or to do something. When a borderline begins to regress and become overwhelmed, it's not just one aspect of the person that is overwhelmed. It's the whole personality that is overwhelmed. They regress. So all of the functions are impaired, including their ability to think, to reason, to plan or to control themselves. They're all

> integrated with each other. And we don't just impair one without impairing the other.

Dr. Chamberlain further explained:

> when you have someone who is vulnerable in those ways because he's not really matured or developed as he should have, than when they're stressed they regress even further back and they become flooded in all areas of their personality, including ability to recognize things, to formulate intent, to rationally weigh consequences, to even sometimes perceive what is going on in a realistic way.

That pattern, according to Dr. Chamberlain, applied to defendant's conduct in this case. Defendant was under a great deal of stress at the time of the occurrence. "As he became flooded, he lost the ability to intend to do things" and "[w]as unable to formulate the intention to even harm the baby under those circumstances." As defendant began to regress and was overwhelmed, he thereby lost "the rational cognitive ability to formulate a plan or to do something." Dr. Chamberlain also said of defendant, "He simply couldn't keep track what was going on and in a rational way understand what he was doing. I don't think he—he understood he would particularly harm the baby."

In *Moore*, the Court concluded that comparable evidence had been sufficient to allow the jury to determine that the defendant had neither formed an intent to commit his homicidal acts, nor had sufficient knowledge of those acts. The Court observed that the defendant's expert witness, a psychiatrist, testified that the fact that the defendant had killed his son in the course of killing his wife indicated "that he was not aware of what he was doing or not in control of what he was doing, because he certainly felt the opposite toward Kory [his son] [than he felt toward Melva [his wife]]." *Id.* 122 *N.J.* at 436, 585 *A.*2d 864. The Court noted the expert's testimony: " 'But [he] knew what he was doing?" Answer: "I think not. But there is always a continuum. He could have been aware, minimally aware.' " *Ibid.*

*Breakiron* pointed out that only when the evidence is viewed in the light most favorable to the defendant, and still no suggestion appears that the defendant's faculties had been so affected as to render the defendant incapable of purposeful and knowing con-

duct, may the trial court deny the diminished-capacity defense. 108 *N.J.* at 617, 532 *A.*2d 199. Courts have generally agreed that the admission of psychiatric testimony on the issue of mental state is an evidentiary question that should not be unduly restricted. *See, e.g., Humanik, supra,* 871 *F.*2d 432 (holding that instruction imposing on defendant burden of proving existence of a mental disease or defect violated defendant's due process rights by preventing evidence from reaching jury); *United States v. Pohlot,* 827 *F.*2d 889, 900 (3d Cir.1987) ("As long as criminal liability is determined in part through subjective states of mind, a rule barring evidence on the issue of mens rea may be unconstitutional."); *Hughes v. Matthews,* 576 *F.*2d 1250 (7th Cir.1978) (holding that exclusion of psychiatric evidence offered to show that petitioner had lacked the capacity to form specific intent to kill is constitutionally infirm, when psychiatric evidence is competent and relevant to issues regarding mental state); *United States v. Brawner,* 471 *F.*2d 969, 998–1001 (D.C.Cir.1972) (same); *ABA Criminal Justice Mental Health Standards* § 7–6.2 at 353 ("Evidence, including expert testimony, concerning the defendant's mental condition at the time of the alleged offense which tends to show the defendant did or did not have the mental state required for the offense charged should be admissible.")

■ Viewing the evidence in the light most favorable to defendant, we find that it offers at least the suggestion that defendant's faculties were sufficiently affected to preclude him from engaging in purposeful or knowing conduct when he harmed the infant. That suggestion is present in Dr. Chamberlain's testimony: "he lost the ability to intend to do things"; he was "unable to formulate the intention to even harm the baby under those circumstances"; he did not "understand" he would particularly harm the baby. That evidence is sufficient to allow a jury to consider and determine whether defendant suffered from a mental disease or defect that impaired his cognitive capacity and prevented him from forming the intent or knowing that his acts would cause the death of the child.

Accordingly, we find that the improper instruction withdrawing the defense of diminished capacity from the jury constituted harmful error and requires the reversal of defendant's conviction for murder.

## III

Defendant also contends that the instructions on murder were confused with respect to the two types of murder under the Code, namely, purposeful murder and serious-bodily-injury murder. He further argues that the evidence was not sufficient to justify the submission of purposeful murder to the jury. The Appellate Division rejected both those contentions.

During its deliberations, the jury sent a note asking for clarification concerning the intent necessary for serious-bodily-injury murder. The jury's note said, "Would you please cite another example of knowingly causing serious bodily injury. Must it involve knowing that the action would more than likely result in death?" The court declined to give another example and instead gave a further instruction about the mental state necessary for knowingly causing serious bodily injury, relying on *State v. Gerald*, 113 *N.J.* 40, 549 *A.*2d 792 (1988). Defendant claims that that instruction, patterned on *Gerald*, used the word "unintentional" to describe a death caused as a result of infliction of serious bodily injury, and that such an instruction was misleading and steered the jury away from manslaughter charges and towards the murder charge.

The trial court's charge on this point largely mirrors this Court's discussion of serious-bodily-injury murder in *Gerald*. The Court held in *Gerald* that "to be convicted of murder under those provisions the actor need have no mental state in respect of the actual result—death—but need act only with the purpose or knowledge that serious bodily injury result." 113 *N.J.* at 83, 549 *A.*2d 792. In this case, the trial court said, "Thus to be convicted of murder under these provisions, the actor need not have any

mental state with regard to the actual result of death. He need only act with the purpose to cause serious bodily injury."

The Court also stated in *Gerald*, "Clearly the crimes of purposeful and knowing murder include not only those actors who intend their victims' deaths, but also those actors who intend to inflict only serious bodily injury, and death unintentionally results." *Ibid.* In this case, the court instructed the jury, "And if in causing that serious bodily injury the unintentional death results intentionally or unintentionally, that is murder."

We are satisfied that viewed in its totality, the trial court's charge accurately reflected the law on knowingly or purposely engaging in serious-bodily-injury murder.

Defendant also claims that the trial court should not have instructed the jury on purposeful or knowing murder because the evidence did not support such a charge, and therefore that charge prejudiced the jury towards returning a verdict of murder rather than manslaughter.

In *State v. Christener*, 71 *N.J.* 55, 69–73, 362 *A.*2d 1153 (1976), this Court held that the trial court had committed plain error in instructing the jury on first-degree murder when the facts in the record did not support the charge. It so ruled despite the fact that the jury had returned a verdict of second-degree murder, because the inclusion of such a charge could have raised an inference in the jurors' minds that, at the very least, the elements of the less-serious crime were supported by the evidence in the record, and thus created a danger of a compromise verdict. *Id.* at 72–74, 362 *A.*2d 1153. Defendant claims that the jurors in this case, confronted with the "more serious" charge of purposeful or knowing murder, may have compromised by convicting defendant of serious-bodily-injury murder rather than a lesser form of homicide.

The record demonstrates that the State presented ample evidence to justify charging the jury on purposeful and knowing murder. That evidence included defendant's statements to Officer

Nappoletano that he wanted to hurt the baby; that he knew that he was hurting the baby; that he shook the baby for thirty seconds to a minute while squeezing the child with all his might; and defendant's statement to Officer Fatigante that he had "intended to do it all along" because the child was the product of his girlfriend having been raped.

Defendant also points to the sentencing court's statement that "[t]here is no question but that the jury concluded that, at least in my mind there is no question, but that this defendant had ... purposely or knowingly caused serious bodily injury that ultimately resulted in death." Defendant claims that that statement shows that the trial court knew that the record did not contain evidence sufficient to support the purposeful and knowing murder charges. However, the court's belief that the jury had based its verdict on the serious-bodily-injury charge does not equate with a finding that a reasonable jury could not have found that defendant had purposefully or knowingly killed the child. The court ruled twice on that issue in denying defendant's motions for acquittal. In both instances, the court concluded that sufficient evidence existed to submit that issue to the jury.

■ Defendant also contends that the State abandoned that charge in its summation to the jury. In its summation, the State told the jury:

> Let me tell you what I'm not talking about. As I told you in my opening statement I'm not arguing to you—you may find, and if you do it will speed things up, but I'm not asking you to be too concerned about whether or not the State has proven that the defendant purposely caused the death because I'm not arguing that his purpose was to cause death.

Thus, the State never expressly abandoned the charge of purposeful murder. Rather, the State simply chose to emphasize the charge that required lesser culpability. The State never told the jury that it could not find defendant guilty of the crime of purposeful murder and never indicated any decision to the trial court that the State had abandoned that charge.

In sum, the record fully supports the determination of the Appellate Division that the trial court's instructions on murder

were adequate, the evidence properly viewed could support the charge of purposeful murder, and the State had not abandoned that charge.

## IV

Defendant claims that his confession was extracted in violation of his federal and state rights against self-incrimination. See *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966); *In re Martin,* 90 *N.J.* 295, 331, 447 *A.*2d 1290 (1982). He asserts that the confession should have been excluded from evidence and that its admission constitutes reversible error.

In his first discussion with investigators at the hospital and in his first written statement, defendant made no mention of shaking the child. Only in the second written statement, given after defendant's interview with Detective DeFillipo, did defendant admit to shaking the child. Defendant argues that that statement was coerced because he was emotionally and psychologically vulnerable and the police resorted to trickery to gain it.

Detective DeFillipo pursued a specific strategy in interrogating defendant. DeFillipo reasoned that "why this baby was injured could possibly be due to the fact that Steve Galloway is angry towards this baby because of how this baby was produced." DeFillipo told defendant that the baby was seriously hurt, and asked defendant what he had done to the baby so the doctors could treat it accordingly. DeFillipo conceded that the only goal in pursuing this kind of interrogation was to gain information that might be used in a criminal prosecution, and not to assist in the child's medical treatment. DeFillipo's tactic, therefore, may be accurately described as a deliberate act of deception to secure a confession.

Defendant contends that because of his psychological state at the time of his interview with DeFillipo, the deception by the police was a "cruel lie" that overbore his will. Defendant points to the officers' observations that he seemed "extremely nervous" and to the revelation that he was "crying" and expressing "his sorrow

verbally and in tears." Defendant's mental state throughout his interview was "sorrowful," and he cried at times both before and after DeFillipo referred to the child's background. Defendant notes that after giving the statement to DeFillipo, he was "sobbing uncontrollably." He urges that those facts demonstrate that DeFillipo's tactic rendered his subsequent statement involuntary.

Prior to the trial, the court held a *Miranda* hearing to determine which statements, if any, the court would admit into evidence. The trial court found that at the time that Detective DeFillipo spoke to defendant, defendant was not under arrest or in custody, and that defendant understood his *Miranda* rights and waived them. The trial court concluded that the police had not coerced defendant into making the statement, had offered no promises in exchange for his statement, and had not overborne defendant's will. For those reasons, the trial court admitted defendant's confession.

The State must prove the voluntariness of a confession beyond a reasonable doubt. *State v. Kelly,* 61 *N.J.* 283, 294, 294 *A.*2d 41 (1972). Federal and New Jersey state standards used in determining whether the defendant's will was actually overborne are similar. A court must look at the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation. Relevant factors to be considered include the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved. *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 226, 93 *S.Ct.* 2041, 2047–48, 36 *L.Ed.*2d 854, 862 (1973); *State v. Miller,* 76 *N.J.* 392, 402, 388 *A.*2d 218 (1978). An involuntary confession can result from psychological as well as physical coercion. *Miller v. Fenton,* 796 *F.*2d 598, 603 (3d Cir.), *cert. denied,* 479 *U.S.* 989, 107 *S.Ct.* 585, 93 *L.Ed.*2d 587 (1986). Unlike the use of physical coercion, however, use of a psychologically-oriented technique during questioning is not inherently coercive. *Miller, supra,* 76 *N.J.* at 405, 388 *A.*2d

218. The real issue is whether the person's decision to confess results from a change of mind rather than from an overbearing of the suspect's will. *Ibid.*

The fact that the police lie to a suspect does not, by itself, render a confession involuntary. In *Frazier v. Cupp,* 394 *U.S.* 731, 89 *S.Ct.* 1420, 22 *L.Ed.*2d 684 (1969), the United States Supreme Court upheld a defendant's conviction even though an officer had falsely told the defendant that another party had confessed. Reviewing the totality of the circumstances, the Court held that because the defendant was a mature person of normal intelligence who had received partial warnings of his constitutional rights, and because the questioning had lasted only slightly over an hour, the confession was admissible. *Id.* at 739, 89 *S.Ct.* at 1425, 22 *L.Ed.*2d at 693.

In *Miller, supra,* 76 *N.J.* 392, 388 *A.*2d 218, this Court held the defendant's confession admissible despite the fact that the interrogating officer had given assurance that he was acting solely in the defendant's interest. The detective told the defendant that whoever had killed the victim was not a criminal who should be punished, but rather was a person in need of medical treatment, and that the officer would help him with his problem if he told the truth. The Court conceded that "this technique moves into a shadowy area," *id.* at 404, 388 *A.*2d 218, but concluded that the confession had been voluntary considering that the defendant was an adult of thirty-two years, had a prior conviction for which he had served time, and that the questioning had lasted for only an hour. *Ibid.* The Court noted that the defendant "was in no way deluded or misled into believing that the state trooper was acting in any capacity other than as an interrogating police officer in the investigation of a serious crime." *Ibid.*

In *Fenton, supra,* the Third Circuit Court of Appeals, considering Miller's habeas corpus petition, held that the misrepresentations by the police did not justify overturning the conviction. In concluding that the confession was admissible, the court stated that psychological ploys, including playing on the suspect's sympa-

thies, may play a part in the suspect's decision to confess. 796 *F.*2d at 607. The Court believed that "Miller had made an uncoerced decision to unburden his inner tensions and to acknowledge his guilt." *Id.* at 612.

Cases holding that police conduct had overborne the will of the defendant have typically required a showing of very substantial psychological pressure on the defendant. See *Darwin v. Connecticut,* 391 *U.S.* 346, 88 *S.Ct.* 1488, 20 *L.Ed.*2d 630 (1968) (holding defendant's will was overborne when defendant was kept from speaking to attorney or other persons for thirty to forty-eight hours); *Clewis v. Texas,* 386 *U.S.* 707, 87 *S.Ct.* 1338, 18 *L.Ed.*2d 423 (1967) (finding defendant's will overborne when police subjected defendant with fifth-grade education to thirty-eight hours of intermittent interrogation, and did not notify defendant of right to attorney; also noting possibility of deprivation of food, sleep and human contact); *Gallegos v. Colorado,* 370 *U.S.* 49, 82 *S.Ct.* 1209, 8 *L.Ed.*2d 325 (1962) (holding defendant's will was overborne after police detained fourteen-year-old for five days during which time he saw no lawyer, parent, or other friendly adult); *Blackburn v. Alabama,* 361 *U.S.* 199, 80 *S.Ct.* 274, 4 *L.Ed.*2d 242 (1960) (holding that defendant's will was overborne when police interrogated defendant for eight to nine hours in small room occasionally filled with police officers, during which time defendant saw no friends, family, or counsel).

The degree of psychological pressure illustrated by those decisions was not evident in this case. The police had no reason to believe that defendant would be particularly vulnerable to interrogation. At the time of the arrest, defendant was twenty-seven years old. He had a tenth grade education, but had received a G.E.D. Psychological testing shows that defendant's IQ is "dull normal." Defendant had served in the Army for three years, receiving (according to defendant) an honorable discharge. Defendant had some minimal experience with the police, from a prior arrest and conviction for writing bad checks. Moreover, at the police station, defendant was not deprived of food or drink.

Defendant saw his father, albeit in the presence of the police. Although defendant may not have slept that night, he did not appear tired. Defendant appeared to be under stress and was crying. However, the fact that defendant was distressed and emotional is not by itself sufficient to render his confession involuntary. *Fenton, supra,* 796 *F*.2d at 613.

Following his first statement, defendant was told that he was free to leave. Although defendant was not yet in custody, he was repeatedly told pursuant to *Miranda* that whatever he said would be used against him. Given that he was asked to go to the police station to make a statement, that he was repeatedly rewarned of his *Miranda* rights, that he had said at the hospital, "I hope I don't get blamed for this," we can readily infer that defendant was aware of the purpose of the interrogations.

We conclude that the interrogation that elicited defendant's confession did not violate his rights against self-incrimination, and that his confession was the result of a knowing, voluntary, and intelligent waiver of those rights, in accordance with the *Miranda* standards.

## V

Defendant was convicted of third-degree endangering the welfare of a child. He contends that the evidence did not justify a conviction of that crime because he did not have sufficient responsibility for the care of the child.

At the time of defendant's trial, the Code section, *N.J.S.A.* 2C:24–4a, prescribing the third-degree crime of endangering a child applied to

[a]ny person having a legal duty for the care of a child or who has assumed responsibility for the care of the child, who engaged in sexual conduct which would impair or debauch the morals of the child, or who causes the child harm that would make the child an abused or neglected child as defined in R.S. 9:6–1, R.S. 9:6–3 and P.L.1974, c. 199, s. 1 (2C:6–8.21)

Any other person who engaged in such conduct was guilty of a crime of the fourth degree. *N.J.S.A.* 2C:24–4a. (In 1992, the

Legislature amended the statute to elevate the offense of endangering the welfare of a child to crimes of the second and third degree, respectively. *L.*1992, *c.* 6, § 1.) The trial court instructed the jury that it had to decide whether, "on the basis of all of the surrounding circumstances," defendant had "assumed responsibility for the care of" the child. However, the court did not explain the meaning of that phrase. Furthermore, the court did not instruct the jury that if it failed to find that defendant had not assumed such responsibility, it might nonetheless find him guilty of a lesser degree of the same crime, specifically, fourth-degree endangering of a child. Defendant, however, did not object to the trial court's instruction.

The trial court and the Appellate Division agreed that defendant, by virtue of his agreeing to watch the child while Ms. Brazilian was out, had assumed responsibility for the child, and therefore could be charged with third-degree child endangerment under the statute. Defendant contends that the Legislature intended the statute to apply only to persons having a longlasting, legally-recognized relationship with the child.

Contrary to defendant's assertion, it is clear from the plain language that the statute was intended to apply not only to persons who have a legal duty to care for the child but to others as well. Nevertheless, the class of person "who has assumed responsibility for the care of a child" is phrased ambiguously. The phrase "has assumed responsibility for" could mean that the person has agreed to care for the child temporarily or it could import a more permanent undertaking of the responsibility for the care of the child.

When a statute has more than one possible meaning, courts must look beyond its literal language to determine the legislative intent. *State v. Butler,* 89 *N.J.* 220, 227, 445 *A.*2d 399 (1982). The statute therefore must be examined to discover the understanding to be ascribed to the Legislature in criminalizing particular conduct. We are, moreover, enjoined to construe penal statutes strictly and to construe ambiguous language against the

State.  *State v. Valentin,* 105 *N.J.* 14, 17, 519 *A.*2d 322 (1987); *State v. Carbone,* 38 *N.J.* 19, 23–24, 183 *A.*2d 1 (1962).

██  The intended meaning of the statute prescribing the crime of third-degree child endangerment is perhaps best revealed by its own provisions.  According to the Criminal Law Revision Commission's Final Report, *N.J.S.A.* 2C:24–4 incorporated into the Code the existing law of abuse, abandonment, cruelty, and neglect of children by making such conduct criminal under the definitions of those terms as set forth in Title 9.  *Final Report* at 259.  The child-endangerment provision, *N.J.S.A.* 2C:24–4(a), specifies that the harm that constitutes an element of the crime as that which would constitute the abuse or neglect of a child.  An "abused or neglected child" is defined specifically by reference to *N.J.S.A.* 9:6–1, –3, and –8.21.  Each of those statutes pertains to offenses involving abused or neglected children and incorporates, either directly or by reference, the phrase "person having the care, custody or control of any child."  Thus, a person chargeable with the crime of third-degree child endangerment is a "person having the care, custody or control of any child."

██  The terms "care," "custody," and "control" are not self-defining.  However, those definitions are each intended to describe custodial relationships.  *N.J.S.A.* 9:6–2 describes a "parent and custodian" as a person who is subject to the provisions of Chapter 6.  *N.J.S.A.* 9:6–2 includes as a custodian of a child "any person who has assumed the care of a child, or any person with whom a child is living at the time the offense is committed." *N.J.S.A.* 9:6–2 includes "any person who has assumed the care of a child" in its definition of the child's guardian.  "Custody," in turn, has been defined as having "the general right to exercise continuing control and authority over the person of a child derived from court order or otherwise."  *N.J.S.A.* 9:3–38.  Thus, we can reasonably infer that the Legislature intended the crime of third-degree child endangerment to apply to a person who has "assumed the care of a child" or is "living with the child" or has a "general right to exercise continuing control and authority over" the child.

That understanding of the legislative purpose is further bolstered by the Code's use of Model Penal Code (MPC) § 230.4 as the basis for its provisions. John Cannell, *New Jersey Criminal Code Annotated,* 2C:24–4, cmt. (1) (1992). MPC § 230.4 provides that a person supervising the welfare of a minor commits a misdemeanor if he or she knowingly endangers the child's welfare by violating a duty of care, protection, or support. The comments to MPC § 230.4 reveal an intent to cover only persons with an enduring supervisory relationship with the child. General assaultive or harmful conduct by other persons—akin to New Jersey's fourth-degree crime—is covered elsewhere in the MPC. The comments explain that the prohibition is circumscribed by the requirements that a duty of care, protection, or support must exist as a settled principle. *Model Penal Code and Commentaries, Part II,* § 230.4, cmts. 2 and 3.

Moreover, other courts consider the nature and extent of supervisory responsibility to be an important element in defining criminal responsibility with respect to harm inflicted on children, and have convicted only persons assuming continuous or regular care and control of a child under child-abuse and neglect statutes. *See, e.g., Dowler v. State,* 547 *N.E.*2d 1069 (Ind.1989) (upholding conviction of defendant for neglect of dependent when defendant resided with child and child's father, and had often cared for child when father was not present); *State v. Evans,* 270 *S.W.* 684 (Mo.1925) (finding sufficient evidence to sustain conviction for mistreatment of child in defendant's care and custody, when child's mother had hired defendant to care for child in defendant's home during child's summer vacation); *State v. Healey,* 562 *S.W.*2d 118 (Mo.Ct. App.1978) (upholding convictions of defendant for mistreatment of child over whom he had custody and control, when defendant had lived with child and child's mother for one year and treated child as family member).

The Appellate Division's decision in *State v. Bass,* 221 *N.J.Super.* 466, 535 *A.*2d 1 (1987), is consistent with the notion that continuing responsibility must be a basic element of the crime of

third-degree endangerment. There, the defendant, found guilty of third-degree endangerment of a child, had a nine-year ongoing relationship with the child's mother and had fathered five children with her. *Id.* at 470, 535 *A.*2d 1. The Appellate Division found sufficient evidence in the record to infer that the defendant was the child's father and had assumed responsibility for the child's care on that day to support a conviction for third-degree endangerment of a child. *Id.* at 489, 535 *A.*2d 1.

We have previously recognized the Legislature's concern with the particular emotional harm to children that justifies the more severe penalty of the crime of third-degree child endangerment. In *State v. Miller,* 108 *N.J.* 112, 527 *A.*2d 1362 (1987), we considered the purpose of *N.J.S.A.* 2C:24–4 in determining whether convictions for aggravated sexual assault, *N.J.S.A.* 2C:14–2a(1), and child endangerment, *N.J.S.A.* 2C:24–4a, should merge. In holding that the convictions should not merge, we noted that a conviction for third-degree endangerment requires an additional element of proof, namely, a parental or custodial relationship. *Id.* at 120, 527 *A.*2d 1362. We also relied on the added gravity of the third-degree offense that arises from the profound effect on the child when the harm is inflicted by a parental figure in whom the child trusts. *Ibid.*

We are satisfied that the internal references within the provisions of *N.J.S.A.* 2C:24–4 and its legislative history indicate that the third-degree crime of child endangerment should apply to those who have assumed a general and ongoing responsibility for the care of the child. That responsibility may be legal and formal or it may arise from informal arrangements. It may be based on a parental relationship, legal custody, or on less-structured relations; or it may arise from cohabitation with the child's parent. The actor, however, must have established a continuing or regular supervisory or caretaker relationship with the child that would justify the harsher penalties of the third-degree crime of child endangerment under *N.J.S.A.* 2C:24–4. Conversely, a person assuming only temporary, brief, or occasional caretaking functions,

such as irregular or infrequent babysitting, would be chargeable with child endangerment in the fourth degree.

In light of our construction of the statute, we find that the trial court's instruction was plainly erroneous in that it failed to instruct the jury that to find that defendant had assumed responsibility for the child within the meaning of the statute, it must find that he had assumed a caretaking function over the child on a continuing, regular, or recurrent basis.

We conclude that the evidence was not sufficient to justify the submission of the third-degree child-endangerment charge to the jury. The evidence shows that at the time of crime, defendant did not live with or near Ms. Brazilian and her baby. Defendant had dated her for only three months, visiting her on a weekly basis. Although he planned eventually to marry her and adopt the baby, the evidence does not indicate when that was to occur. Further, no evidence whatsoever concerned whether defendant had ever regularly, frequently, or continuously assumed the care of the child. Although defendant's relationship with the child may have been more than that of a mere babysitter, the evidence does not create a reasonable inference that defendant had assumed the kind of ongoing and continuous caretaking or supervisory responsibilities over the child that would be essential to establish the crime of third-degree endangerment. The evidence, however, is sufficient to support a charge on the lesser offense of fourth-degree endangerment. *N.J.S.A.* 2C:24–4(a) requires proof that defendant caused the child harm that would make the child an abused or neglected child as defined in *N.J.S.A.* 9:6–1 and *N.J.S.A.* 9:6–3. Therefore, on remand, with respect to child endangerment, the State may seek conviction only of fourth-degree endangerment.

## VI

We reverse the judgment of the Appellate Division, which sustained the convictions for murder and third-degree child endangerment, and remand the matter for a new trial.

O'HERN, J., concurring.

I agree with the Court's disposition of the issues in this case. One aspect of that disposition prompts these observations.

On November 3, 1992, the New Jersey Constitution was amended to state:

It shall not be cruel and unusual punishment to impose the death penalty on a person convicted of purposely or knowingly causing death or purposely or knowingly causing serious bodily injury resulting in death who committed the homicidal act by his own conduct or who as an accomplice procured the commission of the offense by payment or promise of payment of anything of pecuniary value.

[*N.J. Const.* art. I, ¶ 12.]

Legislation "designed to ensure that the amendment is given full effect * * * clearly state[s] that the term 'homicidal act' [that exposes an actor to the death penalty] means conduct that causes 'death or services [sic, should read "serious"] bodily injury resulting in death.'" A. 2113, 205th Leg., 2d Sess. (approved May 5, 1993). The implicit assumption by the Legislature and the Governor and the people of New Jersey who voted for the constitutional amendment is that serious-bodily-injury murder (SBI murder) would be a death-eligible offense under both the New Jersey Constitution and the Constitution of the United States.

*Tison v. Arizona,* 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), requires a minimum culpability of "reckless indifference" on the part of a major participant in a felony to sustain a death-penalty conviction under the Eighth Amendment to the Constitution of the United States. *See also Enmund v. Florida,* 458 *U.S.* 782, 797, 102 *S.Ct.* 3368, 3376, 73 *L.Ed.*2d 1140, 1151 (1982) (holding that imposing death penalty is disproportionate for one who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed"). The question arises: what mental state is required of the actor who commits the homicide?

In *Gerald,* the Court wrote:

Clearly the crimes of purposeful and knowing murder include not only those actors who intend their victims' deaths, but also those actors who intend to inflict only serious bodily injury, and death *unintentionally* results. Thus, to be convicted of murder under those provisions, the actor need have no mental state in respect of the actual result—death—but need act only with the purpose or knowledge that serious bodily injury result.

[113 *N.J.* at 83, 549 *A.*2d 792 (emphasis added).]

In this case, jurors specifically asked for a definition of SBI murder: "Would you please cite another example of knowingly causing serious bodily injury. Must it involve knowing that the action would more than likely result in death? Does it involve knowing that the action would more than likely result in death?" The jurors had been alerted to the probable/possible distinction with respect to the results because of the trial court's definitions of aggravated and reckless manslaughter. The court told the jury with respect to SBI murder: "[T]he actor need not have [any] mental state with regard to the actual result of death." That definition of the mental state may need to be re-examined in light of the restated constitutional and legislative intent.

Recall that in *Gerald* the Court reasoned that SBI murder was non-capital by implication from the fact that by making aggravated manslaughter a non-capital offense,

the legislature clearly has rejected the *Tison* Court's conclusion that one who causes death while acting with a "reckless indifference to human life" can be subjected to the death penalty. * * * Therefore, the least opprobrious mental state that would sustain imposition of the death penalty under the eighth amendment is insufficient to support even a conviction for non-capital murder under our Code.

[113 *N.J.* at 78, 549 *A.*2d 792 (citations omitted).]

I believe that we should resolve the interpretive issues before the trial of a capital case under the 1992 amendment and 1993 enabling legislation.

CLIFFORD, J., dissenting in part.

Except for its treatment of defendant's conviction for third-degree endangering the welfare of a child, the Court's opinion receives my full endorsement. My disagreement on the child-endangerment charge is minor indeed, being directed not at the

majority's flawless exposition of the law but rather at the application of that law to the facts in this record. However, in one sense the disagreement is significant: the Court would vacate the third-degree child-endangerment conviction and remand for retrial only on the fourth-degree category of that offense, while I would permit retrial on the third-degree charge.

The Court concludes, *ante* at 662, 628 *A*.2d at 751, that "the evidence was not sufficient to justify the submission of the third-degree child-endangerment charge to the jury," pointing to defendant's and Ms. Brazilian's living apart, the brevity of their relationship, the absence of a firm date for their marriage, and the paucity of evidence concerning the frequency with which defendant cared for the child victim. *Ante* at 662, 628 *A*.2d at 751. If you add to the foregoing, however, the facts that the child had been named "Steven" after defendant and another of Ms. Brazilian's relatives; that defendant had planned to move into the area; that defendant had expressed the wish to adopt the child and the child's four-year-old sister; and that when asked if the child was his, defendant twice told his interviewer, "Biologically, no.", then a jury, under proper instructions as so clearly explicated in the Court's opinion, could conclude that defendant had "assumed a caretaking function over the child on a continuing, regular, or recurrent basis," *ante* at 662, 628 *A*.2d at 751.

I would therefore remand for retrial on the third-degree child-endangerment charge as well as on the murder charge.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

Concurring—Justice O'HERN—1.

Concurring in part; dissenting in part—Justice CLIFFORD—1.