755 A.2d 1168 (2000)
333 N.J. Super. 356
STATE of New Jersey, Plaintiff-Respondent,
v.
Darnell WILLIAMS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 22, 2000.
Decided June 29, 2000.
*1169 Ivelisse Torres, Public Defender, for defendant-appellant (John J.A. Burke, Designated Counsel, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, for plaintiff-respondent (H. John Witman, III, Deputy Attorney General, of counsel and on the brief).
Before Judges HAVEY, KEEFE and COLLESTER.
The opinion of the court was delivered by COLLESTER, J.A.D.
Tried to a jury, defendant Darnell Williams was convicted of second degree possession of a weapon for an unlawful purpose, contrary to the provisions of N.J.S.A. 2C:39-4a (count one); and third degree possession of a handgun without a permit to carry, contrary to the provisions of N.J.S.A. 2C:39-5b (count two). The State moved for a sentence under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Prior to sentencing, the court conducted a hearing on the application of the NERA as well as the Graves Act, N.J.S.A. 2C:43-6. The court determined that both provisions were applicable and sentenced defendant under NERA to a term of ten years imprisonment with an eight year and six month period of parole disqualification on count one. A concurrent five year term of imprisonment with a two and one-half year period of parole disqualification was imposed on the second count. A three year term of parole supervision was to follow the aggregate ten year sentence.
The salient facts are as follows. On September 30, 1997, Thomas Friel, an Atlantic City Police Officer, was at work at the Internal Affairs Bureau on South Tennessee Avenue, which was across from a rooming house at 1401 Memorial Avenue. At about 11:30 a.m., he went out to the parking lot to check a report that his car had been vandalized. He heard a gunshot and turned toward the source of the sound on Memorial Avenue. He saw a group of four to six people standing in front of the rooming house. He then saw the defendant standing slightly apart from the others raise his arm in the direction of the second floor porch of the rooming house and fire. Friel not only heard the sound of a shot but also observed a flash of light from an object in defendant's hand.
Friel went back into the Internal Affairs office to get his weapon and alert the other officers to what he had seen and heard. Five officers including Friel responded to the area where the shots were fired. Friel testified that while the original group had dispersed defendant was standing with two or three other people at a nearby parking garage. When the officers approached, defendant backpedaled, turned and ran with the police in pursuit. Defendant fell at one point, and one of the pursuing officers saw him holding a small silver handgun that looked like a .38 caliber semi-automatic handgun. The chase continued toward the boardwalk and into the Sands Casino Hotel multi-level parking garage. The Atlantic City police sealed off the entrances and exits and searched the garage. Defendant was arrested stepping off the elevator on the top level. He had changed his shirt and discarded the cap he was wearing. Both were found in a trash container near the elevator. No gun was ever found. However, a fresh bullet hole was observed in the ceiling of the second floor porch of the rooming house.
Also testifying for the State was Anthony McCoy, the resident manager of the *1170 rooming house. McCoy gave the police a taped statement saying that defendant was among a group of about six people gathered in a hallway outside his apartment. Defendant began to argue with another man, and the group followed them outside onto Memorial Avenue. McCoy reported to police that he was inside when heard a gunshot. He ran outside and saw defendant with a gun pointed in the air. He heard defendant say to the other person, "[F]uck you, and I don't give a fuck ... I'm sick of you punk motherfuckers, and I'll murder one of you niggers." The other man climbed the apartment stairs and onto a second floor porch. Standing near the curb, defendant fired additional shots. The man on the porch fled, and the others scattered as defendant walked away from the rooming house. At trial, McCoy, then a State prisoner, recanted much of his statement including seeing defendant with a handgun.
On appeal, defendant argues the following:

POINT ITHE NO EARLY RELEASE ACT APPLIES ONLY TO VIOLENT CRIMES; THE JUDGE ERRED IN SENTENCING DEFENDANT UNDER THAT ACT BECAUSE DEFENDANT WAS CONVICTED OF A CRIME OF POSSESSION, NOT A "VIOLENT CRIME."

POINT IITHE JUDGE ERRED WHEN HE IMPOSED A GRAVES ACT SENTENCE UPON DEFENDANT BECAUSE THE EVIDENCE DID NOT SUPPORT HIS FINDING THAT DEFENDANT POSSESSED THE HANDGUN FOR THE PURPOSE OF USING IT AGAINST A PERSON.
Defendant contends that NERA is inapplicable to possessory offenses regardless of whether the underlying facts involve the use of a weapon. In contrast, the State argues that NERA is a sentencing statute which permits the sentencing judge to look beyond the proof of the elements of the crime to the factual circumstances of the case in order to determine whether unlawful possession of a weapon meets the NERA standard of a "violent crime."
Imposition of a sentence under NERA requires that a person sentenced to a prison term on conviction of a first or second degree offense constituting a "violent crime" must serve at least eighty-five percent of the sentence before parole eligibility. N.J.S.A. 2C:43-7.2c. The statute further provides in pertinent part as follows:
For purposes of this section, "violent crime" means any crime in which the actor caused death, causes serous bodily injury as defined in subsection b. of N.J.S.A. 2C:11-1, or uses or threatens the immediate use of a deadly weapon.

[N.J.S.A. 2C:43-7.2d.]
Since it is undisputed for sentencing purposes that defendant neither caused death nor serious bodily injury but did possess a deadly weapon, the issue at bar is whether he used or immediately threatened to use a deadly weapon within the meaning of NERA. We examined a similar issue in State v. Johnson, 325 N.J.Super. 78, 737 A.2d 1140 (App.Div.1999), certif. granted, 163 N.J. 393, 749 A.2d 367 (2000). In that case the defendant was charged with robbery of two customers of a check cashing establishment on successive days and with possession of a firearm when he was arrested a week later. Id. at 83, 737 A.2d 1140. The counts relating to the separate victims were severed. At his first trial the jury found Johnson guilty of possession of a weapon when he was arrested but was unable to agree on the other charges. After a separate jury trial for charges relating to the other victim, Johnson was found guilty of first degree robbery as well as second degree unlawful possession of a weapon. In a consolidated sentencing proceeding, the judge applied NERA for the first degree robbery conviction and for both of the second degree weapons convictions. Id. at 88, 737 A.2d 1140.
*1171 Although neither party raised the issue, we held that under the factual setting in Johnson, NERA was not applicable to the sentence for the second degree weapons offenses. State v. Johnson, supra, 325 N.J.Super. at 88-89, 737 A.2d 1140.
We think it plain that a purely possessory crime does not meet this definition. One cannot by mere possession with an unlawful purpose be deemed to have actually caused either death or serious bodily injury or used or threatened the immediate use of a deadly weapon. These are certainly elements of the robberies for which defendant was indicated an, certainly, threat of use of a deadly weapon was an element of the robbery of which defendant was convicted. But they are not elements of the purely possessory crime. A defendant must do more than have the intent to use the weapon unlawfully against the person of another before he meets the statutory definition of a violent criminal. We agree with the holding in State v. Thomas, 322 N.J.Super. 512, 518, 731 A.2d 532 (App.Div.1999), that the No Early Release Act must be strictly construed. Under that canon of construction, we are satisfied that purely possessory crimes must be excluded from its reach.

[Ibid.]
The facts of Johnson are clearly distinguishable. Johnson was found in possession of the weapon a week after the robberies were committed. There was no contemporaneous use of the weapon or threat to use the weapon. In the instant case the facts found by Judge Greenberg following the NERA hearing went beyond mere possession or the mere intent to use the weapon unlawfully against another. Williams brandished the gun on a public street and fired it in the direction of others contemporaneous with a verbal threat to kill. Pedestrians and bystanders, including a small child, were placed in danger by defendant's use of the firearm. In this factual setting we hold that the sentencing judge properly considered facts beyond those limited to proof of the elements of the predicate crime in determining that the offense was a "violent crime" under NERA.
This conclusion does not conflict with our prior holdings that NERA is a penal statute and must be strictly construed. State v. Thomas, 322 N.J.Super. 512, 518, 731 A.2d 532 (App.Div.), certif. granted, 162 N.J. 489, 744 A.2d 1211 (1999); see generally, State v. Galloway, 133 N.J. 631, 658-59, 628 A.2d 735 (1993). We have previously considered its applicability in particularized factual circumstances beyond proof of the predicate crime. See State v. Staten, 327 N.J.Super. 349, 743 A.2d 365 (App.Div.2000). We hold that the possessory offense of unlawful possession of a firearm is not excluded from the imposition of a NERA sentence under all circumstances. The sentencing judge may evaluate the factual circumstances to determine whether the defendant's actions constituted a "violent crime" under NERA.
Defendant's argument that the Graves Act, N.J.S.A. 2C:43-6, is inapplicable as moot because the base term under Judge Greenberg's sentence was under NERA and not the Graves Act.
Affirmed.