**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1691-16T4

STATE OF NEW JERSEY
IN THE INTEREST OF J.W.,
a juvenile.

Argued May 30, 2018 — Decided June 14, 2018

Before Judges Carroll, Mawla and DeAlmeida.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Bergen County,
Docket No. FJ-02-0077-16.

Miles R. Feinstein argued the cause for
appellant.

Ian C. Kennedy, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued
the cause for respondent (Dennis Calo, Acting
Bergen County Prosecutor, attorney; Ian C.
Kennedy, of counsel and on the brief).

PER CURIAM

On July 6, 2015, J.W.,[1] a seventeen-year-old juvenile, was

charged in Complaint No. FJ-02-0077-16 with acts of delinquency

that, if committed by an adult, would constitute first-degree

---

[1]  We use initials to protect the identity of the juvenile and
minor victim involved in these proceedings.  R. 1:38-3(d).

aggravated sexual assault, N.J.S.A. 2C:14-2(a); second-degree sexual assault, N.J.S.A. 2C:14-2(b); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). On July 8, 2015, J.W. was charged in Complaint No. FJ-02-0128-16 with an additional count of second-degree sexual assault, N.J.S.A. 2C:14-2(b).

J.W. was tried before a Family Part judge over seven non-sequential days between January 19, 2016, and July 25, 2016. The judge adjudicated J.W. delinquent for endangering the welfare of a child in Complaint No. FJ-02-0077-16, and sexual assault as charged in Complaint No. FJ-02-0128-16. J.W. was acquitted of aggravated sexual assault and the initial sexual assault charge.

The dispositional order imposed a three-year probationary term with outpatient counselling. The judge ordered J.W. not to have extended unsupervised contact with children under age twelve, and to comply with the requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23. Appropriate fees and penalties were also imposed. J.W. now appeals, and we affirm.

I.

The juvenile charges arise from J.W.'s service as a volunteer at an "English as a Second Language" (ESL) program comprised of elementary and middle school students. The program ran from June 29 to July 10, 2015, and J.W.'s mother, M.W., served as one of the program's teachers. Notably, M.W. taught two groups of

A-1691-16T4

kindergarten-age students during the morning and afternoon sessions with the assistance of J.W., a high school senior.

On July 6, 2015, local police were called to investigate the alleged sexual assault of P.K., a six-year-old female student enrolled in M.W.'s morning ESL class. That afternoon, in front of the school, P.K. reported to her mother, V.K., that one of her male teachers touched her "popa," which is the Russian word for vagina. P.K. also stated the male teacher "put her arm under his pants . . . ." When V.K. asked P.K. to identify the man, P.K. pointed to J.W. and identified him by name. V.K. then asked P.K. to confirm it was J.W. who touched her, and when P.K. did so, V.K. used her cell phone to take a photo of J.W. inside a car he had entered. Soon thereafter, V.K. called her husband, P.K.'s father, who alerted the police.

V.K. and P.K. were taken to the Bergen County Prosecutor's Office, Special Victims Unit, where Detective Wendy Cevallos conducted a forensic interview of P.K. During the interview, P.K. promised to answer all questions honestly, stating she was six-and-a-half years old and had just graduated kindergarten.

Detective Cevallos conducted an exercise where P.K. was shown photographs and asked to identify various body parts. Cevallos then asked P.K. "did something happen to you today?" Despite her initial apprehension, P.K. admitted "[m]y teacher, um, he's

A-1691-16T4

touching my pupu (sic)." Cevallos questioned P.K. further about the inappropriate touching:

> Q: And when you said he touched your pupu what did he use to touch your pupu?
>
> A: His hand.
>
> Q: His hand? Okay. And you said he touched your pupu, was it over the clothes, under the clothes[,] or something else?
>
> A: Under the clothes.
>
> Q: Under the clothes? Okay. And when did he touch your pupu under the clothes?
>
> . . . .
>
> A: Um, like, today.

P.K. further reported J.W. touched the top of her "popo" "a lot of times," both over and under her clothes, but never penetrated her with his fingers. She additionally stated J.W. made her "[t]ouch his popo . . . [u]nder the clothes." Once P.K. made these disclosures, Cevallos used anatomical dolls to encourage P.K. to clarify the alleged acts of sexual assault.

The police then proceeded to J.W.'s home to speak with him about P.K.'s allegations. Upon their arrival they met M.W., who asked J.W.: "Do you know what this is about?" J.W. responded "yes" and reportedly had tears running down his face.

The trial court conducted a bench trial and heard testimony from five witnesses for the State, including another teacher in

4

the ESL program, investigating detectives, P.K., and V.K. At the close of the State's case on July 12, 2016, J.W. moved for a judgment of acquittal on all charges. Viewing the evidence in the light most favorable to the State, Judge Gary Wilcox acquitted J.W. of first-degree aggravated sexual assault because there was no evidence that "the alleged touching of [P.K.]'s vagina involved any penetration . . . ." The judge denied the motion with respect to the remaining charges of sexual assault and child endangerment, finding the State's proofs sufficient to proceed on those charges.

M.W. then testified on her son's behalf. She stated P.K. was one of nine students in her morning kindergarten class. She further indicated J.W. always wore khakis when volunteering at the ESL program and never wore jeans or dungarees, as P.K. described, nor was he ever alone with the students. M.W. stated she never witnessed anything inappropriate between J.W. and any of her students, and specifically, she never saw J.W. "focus attention" on or touch P.K. Testimony[2] also established M.W.'s classroom was

---

[2] M.W. testified that her desk was set up "maybe six inches" from the painting table where P.K. claims the alleged incident occurred on July 6, 2015. M.W. further testified that the chairs in which the students would sit were "very small" and measured twenty-two inches from top to bottom. An "adult chair" in the classroom was twenty-seven and one half inches high. The painting table, however, was only twenty and one half inches tall.

very small and her desk overlooked the tables where the students would sit.

M.W. also discussed her recollection of July 6, 2015, when police responded to her home to investigate P.K.'s complaint. According to M.W., she asked her son if he knew why the police were there. J.W. responded affirmatively, and indicated "it's about pot."

J.W. testified on his own behalf. He stated police arrived at his home on July 6, 2015, and spoke with his mother. M.W. then asked him "do you know what this is about?" J.W. replied "yes, mom, this is about pot." J.W. explained that on Saturday, July 4, 2015, he went to the home of his friend, K.G. About ten individuals were there and they smoked marijuana. The police later went to K.G.'s house after J.W. had departed. However, J.W. testified on redirect examination that "no one who was at [K.G.'s home] told the police anything about [him] and the others smoking marijuana."

On September 12, 2016, in a detailed oral opinion, Judge Wilcox found the State proved beyond a reasonable doubt the endangering charge and the second-degree sexual assault charge that J.W. touched P.K.'s vagina. With respect to that sexual assault charge, the judge explained:

The [c]ourt had ample opportunity . . . to view the witness, the alleged victim [P.K.,] in court. The [c]ourt found her to be a very credible witness. [T]he [c]ourt is aware of . . . inconsistencies in her testimony with regard to . . . the number of times she alleged these incidents occurred. There also was a question as to whether or not the juvenile was wearing jeans or khakis . . . . [T]he [c]ourt also viewed evidence and heard evidence from [M.W.] regarding the desk and chairs . . . in [her] classroom and whether or not this act could have occurred given the way the classroom was set up.

. . . .

But the [c]ourt believes that based on its view of the evidence and the credibility of the witnesses presented, that the State has proven beyond a reasonable doubt . . . that the juvenile intended to touch [P.K.] in the vaginal area and that the touching was done intentionally and knowingly. And that the purpose of the touching was to either degrade or humiliate the victim or to sexually arouse or gratify the actor.

The court found J.W. not guilty of the charge that he had sexually assaulted P.K. by intentionally having P.K. touch his penis. Judge Wilcox found there was

conflicting testimony regarding what J.W. was wearing [on the] day [of the alleged incident]. The victim alleged that he was wearing jeans [but] [t]here was testimony . . . that he wore khakis. . . . [The court is] not finding that the victim was not truthful in her testimony, but given the way I heard the testimony, I think there is some doubt as to whether or not the juvenile actually had the victim touch his penis.

7

Finally, the court found the State proved J.W. endangered the welfare of a child because he had a legal duty for the care of P.K. by virtue of his volunteer role at the school. Relying on State v. Galloway, 133 N.J. 631 (1993), the court found "that a person who has an assumed responsibility for the care of a child may include a . . . volunteer . . . of an institution who is responsible for the child's welfare."

## II.

J.W. raises the following issues on appeal:

> POINT I - THE TRIAL COURT ERRED IN PERMITTING THE FORENSIC INTERVIEW VIDEOTAPE OF P.K. TO BE ADMITTED INTO EVIDENCE AND ALLOWING P.K. TO TESTIFY DESPITE THE TAINT OF SAID INTERVIEW.
>
> POINT II - THE FINDINGS OF GUILT WERE SO WIDE OF THE MARK AS TO CONSTITUTE A MANIFEST INJUSTICE, AND THE SUSTAINING OF THE JUVENILE CHARGES MUST BE REVERSED IN THE INTEREST OF JUSTICE.
>
> POINT III - THE TRIAL COURT COULD NOT SUSTAIN THE CHARGES AGAINST J.W. IN LIGHT OF THE FACT THAT IT HAD A DOUBT WHETHER THE SEXUAL MISCONDUCT EVER OCCURRED.
>
> POINT IV - SHOULD THIS COURT NOT REVERSE THE ADJUDICATION OF THE CHARGE OF ENDANGERING THE WELFARE OF A CHILD, THEN IT NONETHELESS MUST FIND THAT A THIRD-DEGREE OFFENSE WAS COMMITTED[,] NOT A SECOND-DEGREE OFFENSE AS FOUND BY THE TRIAL COURT[,] HAD J.W. BEEN TRIED AS AN ADULT.

Turning to his first point, J.W. contends the court erred in admitting P.K.'s videotaped forensic interview pursuant to N.J.R.E. 803(c)(27), which establishes the tender years exception to the hearsay rule:

> A statement by a child under the age of [twelve] relating to sexual misconduct committed . . . against that child is admissible . . . if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing[3] conducted pursuant to <u>Rule</u> 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse . . . .

J.W. claims the child's statements were not trustworthy and Cevallos's questioning was not neutral. We disagree.

---

[3]  We have affirmed the admission of an out-of-court statement in a juvenile proceeding without a separate hearing. <u>See</u> <u>State in the Interest of S.M.</u>, 284 N.J. Super. 611, 620-21 (App. Div. 1995) ("Although N.J.R.E. 803(c)(27)(b) requires the court to 'find, in a hearing conducted pursuant to <u>Rule</u> 104(a), that on the basis of the time, content and circumstances of the statement that there is a probability that the statement is trustworthy,' we do not conclude that the failure of the court, sitting as the trier of fact, to conduct a hearing pursuant to <u>Rule</u> 104(a) is so violative of N.J.R.E. 803(c)(27) as to warrant reversal.").

Having reviewed the record, we conclude that all elements of the rule were met. Counsel for J.W. was aware the State sought to introduce the videotape of P.K.'s forensic interview and had a fair opportunity to prepare to meet her statement. Additionally, Judge Wilcox determined P.K.'s statements were trustworthy as the entire interview was recorded and P.K. spontaneously revealed J.W. touched her "popa." P.K. testified at trial, and her testimony corroborated her earlier statements. The judge expressly found P.K. was a "very credible" witness.

We reject J.W.'s argument that the interview techniques utilized by Cevallos were so unduly suggestive and coercive as to create a "substantial likelihood of irreparably mistaken or false recollection" under State v. Michaels, 136 N.J. 299, 320 (1994). Rather, as the State points out, English is not P.K.'s native language and the fact "[t]hat Detective Cevallos assisted P.K. in recalling a word for a male penis or female vagina is of no moment. . . . Detective Cevallos properly established how P.K. referred to those body parts before there were any disclosures of abuse."

Thereafter, P.K. consistently maintained her allegations of abuse, namely, that J.W. touched her vagina underneath her underwear on July 6, 2015. The record does not support a showing "that the victim's statements were the product of suggestive or coercive interview techniques," as J.W. contends. Thus the trial

judge's admission of the recorded forensic interview pursuant to N.J.R.E. 803(c)(27) was not an abuse of discretion. See State v. Morton, 155 N.J. 383, 453 (1998) ("Traditional rules of appellate review require substantial deference to a trial court's evidentiary rulings.").

J.W.'s second and third points warrant little discussion. Essentially, J.W. contends the State did not prove the charges against him beyond a reasonable doubt, and that the trial court's findings to the contrary were so wide of the mark as to constitute a manifest injustice.

Our standard of review in juvenile delinquency bench trials "is narrow and is limited to evaluation of whether the trial judge's findings are supported by substantial, credible evidence in the record as a whole." State in the Interest of J.P.F., 368 N.J. Super. 24, 31 (App. Div. 2004) (citing State v. Locurto, 157 N.J. 463, 471 (1999); State v. Johnson, 42 N.J. 146, 161 (1964)). In order to find a violation, the court must conclude that the State proved each element of the offense charged beyond a reasonable doubt. State ex rel. J.G., 151 N.J. 565, 593-94 (1997). We do not engage in an independent assessment of the evidence as if "[we] were the court of first instance." Johnson, 42 N.J. at 161. Rather, we give special deference to the trial judge's findings, particularly those that are substantially influenced by

the judge's opportunity to observe the witnesses directly.  <u>Id.</u> at 162.  However, we need not defer to the trial judge's interpretation of the law.  <u>State v. Brown</u>, 118 N.J. 595, 604 (1990).

Mindful of these standards, we reject J.W.'s argument that the evidence was insufficient to support the adjudications of delinquency beyond a reasonable doubt.  P.K. provided detailed testimony regarding J.W.'s inappropriate touching and remained consistent about that core allegation despite a "very vigorous cross examination."  P.K.'s testimony was corroborated by the videotape of her forensic interview as well as the in-court testimony and forensic interview of her mother, V.K.  The court also found J.W.'s denial of the sexual contact was not credible.

In light of those findings, Judge Wilcox concluded J.W. committed sexual assault in violation of N.J.S.A. 2C:14-2(b) when he touched P.K.'s vagina underneath her underwear.  Additionally, when the sexual contact occurred, J.W. was acting in a supervisory role as a volunteer at the school and had "assumed responsibility" for P.K.  Consequently, sufficient credible evidence in the record supports the court's finding that J.W. endangered the welfare of a child in violation of N.J.S.A. 2C:24-4(a).

Equally unconvincing is J.W.'s alternative argument in Point IV that he should be adjudicated delinquent of third-degree, rather

12

than second-degree, endangering the welfare of a child in the event we otherwise find the proofs sufficient to sustain that charge. He contends he "was merely an unpaid volunteer," and, as such, "[h]e did not have a continuing or regular supervisory or caretaker relationship with P.K." so as to elevate his conduct to what would constitute a second-degree offense if committed by an adult.

N.J.S.A. 2C:24-4(a)(1) provides that "[a]ny person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree." Our Supreme Court has recognized this statute applies "to a person who has 'assumed the care of a child' or is 'living with the child' or has a 'general right to exercise continuing control and authority over' the child." State v. Sumulikoski, 221 N.J. 93, 107 (2015) (quoting Galloway, 133 N.J. at 659). Notably, "what propels th[is] offense of endangering . . . to a second-degree offense" is "the profound harm that can be inflicted on a child by one who holds a position of trust . . . ." Id. at 108 (citing Galloway, 133 N.J. at 661).

Here, J.W. was properly adjudicated delinquent of second-degree child engagement because he was one of P.K.'s guardians while she attended the ESL program. "The term 'guardian' is

defined as '[an] employee or volunteer, whether compensated or uncompensated, of an institution who is responsible for the child's welfare . . . .'" <u>G.S. v. Dep't of Human Servs.</u>, 157 N.J. 161, 171 (1999) (alteration in original) (quoting N.J.S.A. 9:6-8.21(a)). Additional support for this conclusion is found in the model jury charge, which instructs that a "person who has assumed responsibility for the care of a child may include a teacher, employee, volunteer, whether compensated or uncompensated, of an institution who is responsible for the child's welfare." <u>Model Jury Charges (Criminal)</u>, "Endangering the Welfare of a Child (N.J.S.A. 2C:24-4(a)(1))" n.4 (rev. Apr. 7, 2014).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION