# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3881-16T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY BURKHALTER,

    Defendant-Appellant.

_____

> Submitted April 19, 2018 — Decided July 25, 2018
>
> Before Judges Haas and Gooden Brown.
>
> On appeal from Superior Court of New Jersey,
> Law Division, Mercer County, Indictment No.
> 14-04-0437.
>
> Joseph E. Krakora, Public Defender, attorney
> for appellant (Lon Taylor, Assistant Deputy
> Public Defender, on the brief).
>
> Angelo J. Onofri, Mercer County Prosecutor,
> attorney for respondent (Caitlyn Kelly,
> Assistant Prosecutor, of counsel and on the
> brief).

PER CURIAM

    Following the denial of his motion to suppress his statement

to police pursuant to Miranda v. Arizona, 384 U.S. 436 (1966),

defendant entered a negotiated guilty plea to two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(3),[1] and one count of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), reserving his right to appeal the denial of his <u>Miranda</u> motion. He was sentenced in accordance with the plea agreement to an aggregate term of twenty-one years' imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. In addition, defendant was ordered to serve the special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4, and comply with the requirements of Megan's Law, N.J.S.A. 2C:7-1 to -23.

On appeal, defendant raises the following single point for our consideration:

> POINT I
>
> UNDER THE TOTALITY OF THE CIRCUMSTANCES, THE STATEMENT BY A SEMI-ILLITERATE AND HOSPITALIZED DEFENDANT, HANDCUFFED TO HIS BED AND NOT FEELING WELL AS A RESULT OF MULTIPLE GUNSHOT WOUNDS, SHOULD HAVE BEEN SUPPRESSED SINCE HE WAS INCAPABLE OF VOLUNTARILY WAIVING HIS <u>MIRANDA</u> RIGHTS AND GIVING A STATEMENT TO POLICE.

Having considered defendant's contention in light of the record and the applicable legal standards, we affirm.

---

[1] The charges pertained to two separate victims, K.M. and P.H.

On January 14, 2014, Judge Robert C. Billmeier conducted a N.J.R.E. 104(c) hearing, at which Trenton Police Officer Nelson Cartagena and Mercer County Prosecutor's Office Detectives Anthony Petracca and Matthew Norton testified for the State. Cartagena and Petracca testified about defendant's December 11, 2012 statement given while hospitalized for near-fatal gunshot wounds, which was the subject of the Miranda hearing and this appeal. Norton testified about an earlier October 19, 2012 statement given at Trenton police headquarters.[2] The judge also reviewed the December 11, 2012 recorded interview.

Petracca was assigned to investigate separate cases involving defendant, who was both the suspect in three sexual assaults, occurring on October 12, November 24, and November 27, 2012, and the victim of a November 28, 2012 shooting. The October 12, 2012 sexual assault occurred in Trenton during a burglary at the home of the victim, K.M. K.M. selected the photograph of defendant's identical twin brother, Steven Burkhalter, out of a photo array and identified him as her assailant. However, Steven Burkhalter was incarcerated in Missouri at the time of the assault.

---

[2] On appeal, defendant does not challenge the admissibility of his October 19, 2012 statement.

A-3881-16T1

In a police interview conducted by Norton on October 19, 2012, in connection with the October 12, 2012 sexual assault of K.M.,[3] defendant did not provide any incriminating statements, but acknowledged that he was known by the street name "Twin." Thereafter, J.R., the victim of the November 24, 2012 sexual assault, identified her assailant by the nickname "Twin." Additionally, P.H., the victim of the November 27, 2012 sexual assault that occurred during a burglary of her Hamilton home, identified defendant as her assailant from a photo lineup.

In the November 28, 2012 shooting, defendant was shot four times by two different assailants and suffered extensive internal injuries, requiring emergency surgery. Following the surgery, on December 4, 2012, Petracca went to interview defendant in his hospital room at Capital Health System. However, due to his medical condition and difficulty speaking with a suction tube inserted in his mouth, defendant was only able to give Petracca the street name of one of the shooters.

---

[3] The recorded interview was conducted after Norton advised defendant of his Miranda rights and obtained a written waiver of his rights. During the administration of the rights, because defendant advised Norton he could not read, Norton read the rights as well as the waiver to defendant. The ensuing colloquy between defendant and Norton also included Norton explaining in detail the meaning of the word "coercion" to defendant.

Petracca returned to the hospital to interview defendant on December 6 and December 10, 2012. Although defendant's medical condition was improving, Petracca refrained from interviewing defendant on either date after inquiring with the nurse about defendant's condition. Nevertheless, after Petracca left the hospital on December 10, 2012, another Trenton Police Detective charged defendant in a complaint-warrant with the sexual assault of J.R. because defendant had expressed his intention to leave the hospital against medical advice.[4]

Cartagena testified that on December 11, 2012, the day after defendant was charged, he was assigned to defendant's hospital room to guard him while he was in police custody. That day, Cartagena observed defendant for approximately eight hours, during which defendant watched television, talked, and otherwise behaved normally, despite being handcuffed to the bed. At defendant's request, Cartagena telephoned Petracca to advise him that defendant wished to speak with him. As a result, Petracca arrived at the hospital some time before 3:30 p.m. However, before speaking with defendant, Petracca talked with defendant's nurse to get an update on his medical condition, as he had in the past.

---

[4] In its opinion, the trial court noted that a December 10, 2012 progress note from defendant's hospital records indicated that defendant "had poor thought organization and detailed recall of events."

Petracca inquired whether the "influence of a medication . . . would affect [defendant's] ability to think [or] make decisions," and confirmed that he would not be interrupting any planned treatment for defendant. After receiving medical clearance, Petracca found defendant's overall condition "substantially" improved and noted "[h]e was no longer attached to devices to assist his breathing[,] [h]e was no longer draining saliva from his mouth," and "[h]e was also actually out of the bed . . . sitting in one of those hospital chairs." Over the next two hours, Petracca "continuous[ly]" recorded his interview with defendant utilizing a "portable recorder that digitally records audio onto a hard drive," which he then "downloaded . . . to a CD."

Initially, the following exchange occurred between defendant and Petracca:

> DETECTIVE PETRACCA: How are you doing? . . . You doing okay?
>
> [DEFENDANT]: I'm getting better.
>
> DETECTIVE PETRACCA: Good. You look a little better. . . . Do you know what's going on or what?
>
> [DEFENDANT]: No.
>
> . . .
>
> DETECTIVE PETRACCA: . . . All right. Before we get started, I've got to go over a couple

6

things with you. And I know that you've probably been through this process before. But before we get started, how are you feeling?

[DEFENDANT]: Not good.

DETECTIVE PETRACCA: Not good? What's bothering you?

[DEFENDANT]: (Indiscernible).

DETECTIVE PETRACCA: Well, I'll talk to you about that, but I just want to make sure first before we start talking that your head is clear, that you understand what I'm saying, and that you're okay, because if you're not healthy[,] I don't want to be talking to you if you're not feeling well. So, are you all right?

[DEFENDANT]: Yes.

DETECTIVE PETRACCA: Okay. . . . I want to go over some stuff. You just need to listen. If you have any questions you can ask me, and then we'll work from there. All right. The first thing I've got to do with you is read you your rights [so that] before we talk you understand what they are. All right? Did you talk to you[r] mom today?

[DEFENDANT]: (Indiscernible).

DETECTIVE PETRACCA: Yeah. [S]he called me last night.

[DEFENDANT]: Am I going to jail?

DETECTIVE PETRACCA: I'm going to talk [about] all of that. We'll talk about it. Let me just get through all this first. Do you read and write English?

[DEFENDANT]: I read a little bit.

A-3881-16T1

> DETECTIVE PETRACCA: . . . All right. Then I'll read you everything so that you won't have to worry about it.

Then, utilizing the Uniform Mercer County Rights and Waiver of Rights Forms, Petracca read aloud and reviewed with defendant his <u>Miranda</u> rights as well as the waiver of rights. After reading the waiver of rights form, Petracca explained to defendant,

> This just basically states that you are willing to talk to me right now. Okay? I am not forcing you. I'm not pressuring you. I'm not holding something over your head saying you'd better talk to me or else. Okay? And actually, you had the officer that was here today call me earlier, is that correct? Okay. So, you can read that and sign there. And remember, . . . if you decide you don't want to talk to me at any point in time you can say, Detective, I don't want to talk to you anymore, and we'll be done.

Defendant signed the forms, acknowledging his understanding of his rights and of his agreement to waive his rights and answer questions without a lawyer present. Defendant also acknowledged on the form that "no promises or threats" were made and that "no pressure or coercion of any kind" was used against him.

Petracca also reviewed with defendant and read aloud the "Arrest Warrant Notice Form," informing defendant that the day before, he had been charged with sexual assault, and bail in the amount of "$100,000 with no 10%" was imposed. Defendant questioned Petracca about the bail and specifically inquired whether there

was a ten percent option. Petracca responded there was "[n]o ten percent" option and explained that "a lot of people . . . use a bail bondsman" in order to pay a lower percentage, but confirmed that "[a]t some point, . . . [defendant] may have to go to jail if [he] can't post bail."

Defendant expressed frustration at his inability to make a phone call while hospitalized to make arrangements to post bail. Petracca agreed to contact defendant's mother and advise her about the bail but refused "to break [the Trenton Police Department's] rules" by allowing defendant to speak to his mother directly.[5] Defendant also expressed concern about being incarcerated with the individuals responsible for shooting him, to which Petracca responded that if defendant "cooperate[d] with that investigation, for [his] safety," those individuals would be incarcerated "in a different jail."

Next, Petracca requested defendant's consent to obtain a DNA sample for use in the investigation of the crimes for which defendant was a suspect. To that end, Petracca read defendant his rights in connection with providing his consent. Defendant voluntarily agreed to provide two buccal swabs, and after Petracca explained that the DNA evidence collected at the crime scenes

---

[5] Cartagena confirmed that defendant was not permitted to make phone calls or have visitors while he was in police custody.

would incriminate him, defendant eventually made incriminating statements about each of the three sexual assaults and corresponding burglaries committed by himself and his associates.

At one point during the interview, when questioned about the identity of the persons responsible for his near fatal shooting, defendant stated, "I don't think I want to talk about that no more." However, the interview continued with defendant telling Petracca his concerns about being identified as a "snitch," his fear for his safety and that of his family members, and his prior burglary convictions in Missouri, for which he had been incarcerated.

Following the hearing, on April 17, 2014, Judge Billmeier issued a written decision denying defendant's motion to suppress his statement to Petracca. The judge found the testimony of all three witnesses credible, and described Cartagena's testimony as "straight forward" and non-evasive, Petracca's as "forthright," and Norton's as "worthy of belief." Next, the judge determined that all four of the Miranda factors were satisfied and concluded that "[d]efendant made a proper waiver of his Fifth Amendment rights, and provided a statement to Detective Petracca of his own volition."

As to the first and second requirements, the judge found "[d]efendant was properly advised of his rights by Detective

Petracca," and, although "he has difficulty reading," defendant reviewed and signed the forms after Petracca read them to him. Turning to the voluntariness of the waiver, guided by State v. Presha, 163 N.J. 304, 313 (2000), the judge concluded that "[c]onsidering the totality of the facts and circumstances," defendant's waiver "was knowing, intelligent and voluntary" and was not "the product of coercion." The judge found support for his decision that "[d]efendant clearly understood what the detective was inquiring about" and "was not suffering any debilitating effects from the medications he was on, or the injuries he suffered" in "the level of discussion" between defendant and Petracca.

In that regard, the judge recounted that defendant was twenty-three-and-one-half years old at the time of the interview, and, although he "did not complete high school and was of limited intelligence, he was able to have a two-hour conversation with Detective Petracca and asked very appropriate questions when the Detective went through his Miranda rights and waiver." The judge also found the questioning "was not prolonged in nature and certainly did not involve any 'physical punishment or mental exhaustion,'" and defendant was "reminded by Detective Petracca in explaining his Miranda rights, [that] he could tell him he wanted to stop talking at any time." The judge found "further

11

evidence of [d]efendant's soundness of mind from [d]efendant's inquiry as to the DNA evidence the detective discussed."

Regarding "advice as to constitutional rights," the judge recounted that "[d]efendant had been apprised of his Miranda rights and waiver by Detective Norton" two months "prior to the waiver at issue." According to the judge, "[d]efendant had properly waived his constitutional rights" at that time and, during questioning, had denied any involvement in the October 12, 2012 sexual assault. In addition to the interaction with Norton, the judge found "[d]efendant was no neophyte to the criminal justice system." The judge detailed defendant's "extensive experience with the criminal justice system in the State of Missouri," where he had "pled guilty to . . . five burglaries, and spent time in state prison."

The judge expressly rejected defendant's argument that "his hospitalization and poor health, his fear for his safety and the safety of his mother, his lack of education, his mental limitations and Detective Petracca's offer of DNA evidence existing," rendered his waiver the product of coercion. Likewise, the judge rejected defendant's assertion that "coercive techniques were used." The judge explained:

> Although defendant was in the hospital, feared
> for his safety, and lacked certain educational
> skills, it is clear to this court [d]efendant

asked Detective Petracca to come visit him at the hospital in order to discuss the charges against him. Detective Petracca informed [d]efendant if he no longer wanted to talk to the Detective at any time, he could stop. Detective Petracca was honest and forthcoming with [d]efendant when asked questions and made no attempt to trick, intimidate, force or confuse [d]efendant into making a statement. Further, this court does not find the [D]etective's offer to aid [d]efendant in finding a way to post bail was made in exchange for incriminating answers to the [D]etective's questions. On the contrary, this court finds Detective Petracca offered to speak to [d]efendant's mother and offered advice as to the services of a bail bondsman prior to any questioning or interrogation as to the sexual assaults. Therefore, this court finds the fourth factor of the Miranda analysis has been satisfied.

Finally, the judge emphatically rejected defendant's argument that "the admission of [d]efendant's statement [was] fundamentally unfair" because "[d]efendant believed Detective Petracca was at the hospital to discuss the matter in which [d]efendant was the victim, and not the sexual assaults [d]efendant was charged with." The judge determined that "a review of the record suggest[ed] just the opposite," because it was defendant who "invited Detective Petracca to the hospital to speak with him about the sexual assault charges pending against him." The judge elaborated:

Most notably, [d]efendant [told] Detective Petracca he [did] not want to talk about his assailant and [did] not end the conversation with the Detective when questioned about the sexual assaults. This

13

court finds it was [d]efendant who led the conversation in the direction of the sexual assaults[,] and as such, it is apparent to the court [d]efendant had every intention of discussing those charges with the Detective.

Additionally this court finds Detective Petracca was clear on his intention to question [d]efendant as to the sexual assault charges[,] as right from the very start of the interrogation, . . . the Detective informed [d]efendant of his charges. Additionally, the Detective informed [d]efendant, "[n]ow, I told you, you got a sex assault charge outta Trenton. They signed a complain[t] on you yesterday . . . ." It is clear [from] this exchange the Detective was not trying to hide his intention in going to the hospital to speak with [d]efendant.

The judge entered a memorializing order, and this appeal followed.

On appeal, defendant argues that "[a]n overall assessment of the uncontested facts that [defendant] was recovering from life-threatening injuries, was handcuffed to his bed, did not feel well, was semi-literate, and suffered from learning and cognitive difficulties" showed that "the State could not prove, beyond a reasonable doubt, that [defendant] voluntarily and intelligently waived his Miranda rights." Further, according to defendant, "[s]ince [his] physical and mental limitations undermined the voluntariness of the Miranda waiver, they inevitably undermined the voluntariness of his statement," and "[t]he trial court ignored the fact that the interrogation pertained to dual investigations." We disagree.

14

When reviewing a trial court's denial of a motion to suppress a defendant's statement, we must "engage in a 'searching and critical' review of the record." State v. Maltese, 222 N.J. 525, 543 (2015) (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014)), cert. denied, ___ U.S. ___, 136 S. Ct. 1187 (2016). We defer to the trial court's findings supported by sufficient credible evidence in the record, particularly when they are grounded in the judge's feel of the case and ability to assess the witnesses' demeanor and credibility. State v. Robinson, 200 N.J. 1, 15 (2009); State v. Elders, 192 N.J. 224, 243-44 (2007).

This standard of review applies even where the motion court's "factfindings [are] based solely on video or documentary evidence," such as recordings of custodial interrogations by the police. State v. S.S., 229 N.J. 360, 379 (2017). We will not reverse a motion court's findings of fact based on its review of a recording of a custodial interrogation unless the findings are clearly erroneous or mistaken. Id. at 380. However, we review issues of law de novo. Ibid.; State v. Shaw, 213 N.J. 398, 411 (2012).

At a hearing challenging the admission of statements made during a custodial interrogation, "the State must prove beyond a reasonable doubt that a defendant's confession was voluntary and was not made because the defendant's will was overborne." State

v. Knight, 183 N.J. 449, 462 (2005). The State must also prove "the defendant was advised of his rights and knowingly, voluntarily and intelligently waived them." State v. W.B., 205 N.J. 588, 602 n.3 (2011). Further, the determination of whether the State has satisfied its burden of proving beyond a reasonable doubt a defendant's statement was voluntary requires "a court to assess 'the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation.'" Hreha, 217 N.J. at 383 (quoting State v. Galloway, 133 N.J. 631, 654 (1993)).

We must determine "whether, under the totality of circumstances, the confession is 'the product of an essentially free and unconstrained choice by its maker' or whether 'his will has been overborne and his capacity for self-determination critically impaired.'" State v. Pillar, 359 N.J. Super. 249, 271 (App. Div. 2003) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973)). The "factors relevant to that analysis include 'the suspect's age, education and intelligence, advice concerning constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature, and whether physical punishment and mental exhaustion were involved.'" Hreha, 217 N.J. at 383 (quoting Galloway, 133 N.J. at 654). The court should also consider defendant's prior encounters with law

16

enforcement and the period of time that elapsed between the administration of <u>Miranda</u> warnings and the defendant's confession. <u>Ibid.</u>

Applying these principles and deferring to the judge's factual findings, which are amply supported by the record, we are satisfied that Judge Billmeier's denial of defendant's motion to suppress his statement was proper. Based on the judge's assessment of the totality of the circumstances, including the characteristics of defendant and the nature of the interrogation, the judge correctly determined that the State satisfied its burden of proving beyond a reasonable doubt that defendant was advised of his rights, knowingly, voluntarily and intelligently waived his rights, and gave a voluntary statement. We reject defendant's contrary arguments and affirm substantially for the reasons expressed in Judge Billmeier's well-reasoned written decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3881-16T1