# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

<div style="text-align: right;">

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2521-21
                A-0391-22

</div>

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

       Plaintiff-Respondent,

v.

C.R.A.G.,

       Defendant,

and

R.G.,

       Defendant-Appellant
       /Cross-Respondent.

_____

IN THE MATTER OF J.G., J.G.,
 and J.G., minors,

        Cross-Appellants.

_____

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

       Plaintiff-Respondent,

<div style="border: 1px solid black; text-align: center; padding: 8px;">

**APPROVED FOR PUBLICATION**

**September 6, 2024**

**APPELLATE DIVISION**

</div>

v.

C.R.A.G.,

     Defendant-Appellant,

and

R.G.,

     Defendant.

_____

IN THE MATTER OF J.G., J.G.,
and J.G., minors.

_____

Argued May 24, 2024 – Decided September 6, 2024

Before Judges Sumners, Smith and Perez Friscia.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. FN-07-0152-21.

Beth Anne Hahn, Designated Counsel, argued the cause for appellant/cross-respondent R.G. in A-2521-21 (Jennifer Nicole Sellitti, Public Defender, attorney; Beth Anne Hahn, on the briefs).

Catherine Wilkes, Assistant Deputy Public Defender, argued the cause for appellant C.R.A.G. in A-0391-22 (Jennifer Nicole Sellitti, Public Defender, attorney; Arthur David Malkin, Designated Counsel, and Catherine Wilkes, on the briefs).

Mary L. Harpster, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons and Janet Greenberg

Cohen, Assistant Attorneys General, of counsel; Mary L. Harpster, on the briefs).

David B. Valentin, Assistant Deputy Public Defender, argued the cause for minors/cross-appellants (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; David B. Valentin, of counsel and on the briefs).

The opinion of the court was delivered by

SUMNERS, C.J.A.D.

Following a joint trial, the family court found defendants R.G. (Rick)[1] and C.R.A.G. (Cynthia), husband and wife, abused or neglected two-year-old M.R. (Michael), who was unrelated to them but under their care, causing him actual harm. The court in turn determined defendants' actions or inactions against Michael resulted in the abuse or neglect of their children J.G (James), born in 2007, J.G. (Jessie), born in 2019, and J.G. (Jasper), in 2020, by "creating [im]minent danger or a substantial risk of being impaired due to their failure to exercise a minimum degree of care."

Defendants' back-to-back appeals raising several issues are consolidated in this one opinion. They contend the family court lacked jurisdiction over them because they were not Michael's legal caretakers under N.J.S.A. 9:6-2

---

[1]  We use pseudonyms and initials the privacy and confidentiality of the children and their families.  R. 1:38-3(d)(12).

and N.J.S.A. 9:6-8.21, and Michael was not named as a subject child in the complaint. Assuming the court had jurisdiction, they contend there was insufficient evidence to support a prima facie case of abuse or neglect of Michael. Moreover, despite that finding, they contend there was insufficient evidence to support the court's determination that their conduct towards Michael placed their children at risk of imminent harm.

Cynthia separately argues the record demonstrates she appropriately cared for Michael. She also contends the Division of Child Protection & Permanency (DCPP) failed to present a sufficient cause of action for abuse and neglect of her children. Relatedly, she contends that the court improperly relied on her treatment of Michael to support its findings on behalf of her biological children, as it constituted inadmissible other crimes evidence.

The Law Guardian cross-appeals, joining Rick's contention that he was not Michael's guardian under N.J.S.A. 9:6-8.21(a). The Law Guardian argues the family court engaged in impermissible burden shifting by concluding that defendants actually harmed Michael. The Law Guardian also argues there was insufficient evidence to support the court's finding that Rick abused or neglected his children.

Given our review of the record and applicable law, we reverse and remand. As to Rick, we conclude the family court did not have jurisdiction

4

over him because there was insufficient evidence that he was Michael's guardian under Title 9. As to Cynthia, we conclude the family court had jurisdiction over her because there was sufficient evidence that she was Michael's guardian under Title 9, but there was insufficient evidence that she caused Michael actual harm and/or placed her children at risk of imminent harm. We therefore remand for the court to remove defendants' names from DCPP's child abuse registry maintained under N.J.S.A. 9:6-8.11.

I.

DCPP's Investigation

On February 19, 2021,[2] Michael was pronounced dead at the Newark Beth Israel Medical Center. DCPP promptly commenced an investigation, focusing on whether: Cynthia, who was caring for Michael before he was taken to the hospital, abused or neglected him; and N.D. (Nadine), Michael's mother, inadequately supervised him. This subsequently led to an investigation by the Essex County Prosecutor's Office against Cynthia regarding Michael's death. Two days later, Cynthia was arrested and charged with second-degree child endangerment of Michael. She was subsequently charged with second-degree aggravated manslaughter.

---

[2] Unless specifically noted, all dates hereafter took place in 2021.

Following its investigation, DCPP substantiated the following allegations against defendants: (1) medical neglect of Michael; (2) inadequate supervision of Michael; and (3) risk of imminent harm to their children, based on their neglect of Michael. On March 22, DCPP filed an order to show cause and verified complaint against defendants, seeking care and supervision of their children due to defendants' alleged actions or inactions leading to Michael's death. The complaint alleged defendants: (1) were unfit and could not be entrusted with their children's care and education; (2) failed to provide their children with "proper protection, maintenance and education"; (3) failed to ensure their children's "health and safety"; or (4) endangered their children's welfare. DCPP did not file a complaint against them regarding abuse or neglect of Michael. The children remained with Rick, and together they resided with his family members who acted as supervisors, pursuant to a safety protection plan. This supervision continued through the complaint's disposition.

Abuse & Neglect Hearing

On October 7, the family court conducted a one-day fact-finding hearing regarding the allegations against defendants. While DCPP's complaint addressed the care and supervision of defendants' children, its case focused on the connection between their conduct and Michael's death. The parties

6

stipulated to the admissibility of DCPP's screening summaries and investigation reports, redacted to exclude certain hearsay statements. DCPP presented two witnesses, Irvington Township Police Officer Daditte Albert and DCPP Family Service Specialist Lisannia Williams. Defendants neither testified nor presented any witnesses. We summarize the relevant evidence.

Cynthia's statements to the Essex County Prosecutor's Office detectives were admitted into evidence. She immigrated from Haiti to the United States in 2018, and because she did not speak any English, a Creole interpreter facilitated her interview. Cynthia first became involved with Michael when her niece, who resided with her, babysat him for three months before moving out in January. Thereafter, Cynthia assumed the babysitting duties. At some point, babysitting Michael became overnight care from Monday through Friday due to Michael's father's changed work schedule. Cynthia said Rick initially was unaware of the babysitting arrangement and was unhappy when he found out, because Michael's parents only provided "clothes, diapers and a gallon of milk," leaving Cynthia to provide food for the child. She noted that Rick also disliked this arrangement because he knew of "the dangers of watching other people['s] children."

Cynthia had several concerns about Michael's physical appearance once she began caring for him. For instance, she noticed "the side of his head"

A-2521-21

appeared swollen, which Nadine said, "was not a problem." Cynthia said Michael also had a swollen eye one day, which Nadine purportedly treated with a cream from the doctor. The next time Michael came to Cynthia's home, he had "bite marks on his back" which, she said, could only have been inflicted by an adult. Cynthia denied he sustained those marks while in her care and claimed that when she asked Nadine about the marks, she also denied they had occurred while in her care. Cynthia also recounted that during a February stay, Michael had fallen out of bed, bruising his back and chest. Cynthia noted two occasions when Michael's tongue had looked white, as if his parents had not brushed his teeth, and he refused to eat. Cynthia otherwise reported that Michael played well with her children, without crying or having tantrums.

Cynthia said that Nadine had dropped off Michael on Monday, February 15. She did not indicate when Nadine intended to pick up Michael. Cynthia did not observe any marks or bruises on Michael's body when he first arrived. Because Michael previously fell off the bed, Cynthia made him a bed on the living room floor. On Tuesday, she noticed he was not eating. He also began acting out, having "tantrums" and "throwing himself on the floor." When questioned about this, Cynthia said Michael would be sitting down and then would "throw" his body onto the floor "from side to side." Rick witnessed this behavior. Cynthia said, "whenever she would [e]nter the room [Michael]

8

would stop throwing himself on the floor." His behavior on Thursday was the "worst" because he started scratching his face. Rick was home at the time and witnessed this behavior.

On Friday, February 19, Cynthia gave Michael his morning milk bottle, which he poured on the floor and "all over himself." Given that Michael's behavior "was getting out of hand," Cynthia asked her oldest son James, then fourteen-years old, to watch Michael while she used the bathroom, directing him to "hold [Michael] if he [went] into another tantrum." While Cynthia was in the bathroom, James went to the kitchen to get something to eat. She believed that while she used the bathroom, Michael was "punching and kicking." She heard James say "no, no, no," followed by a "loud bang." When she came out of the bathroom, she saw Michael on the floor, blood coming from his head and mouth. She removed Michael's tee-shirt, wet it with water, and put it on his face. Because she did not speak English and did not know who to call for emergency medical services, she telephoned her cousin, who called for help.

Irvington Township police officer Daditte Albert, one of the officers dispatched to defendants' home, testified. Cynthia's accounting of the February 19 events to Albert were consistent with her statement to the Prosecutor's Office detectives. Cynthia told Albert that Michael had not been

9

"acting like his normal playful self" and was "erratic and unstable." Per Albert's police report, Cynthia stated that on Wednesday, February 17, Michael had difficulty eating, he "would throw his head onto the floor and dig his nails into his skin until he cut himself," and "scream[ed] and cr[ied] continuously."[3] Albert testified defendants made several attempts to contact Michael's parents, including via text messages, missed phone calls, and voicemails, but the parents never responded. Cynthia also told Albert that after Michael hurt himself and her cousin called 911, she repeatedly attempted to call Nadine. During cross-examination, Albert agreed that Cynthia's response to Michael's injuries—wrapping his head and seeking assistance—was appropriate.

Hospital records stated Michael was "unresponsive" when emergency services arrived at defendants' home, presented as in "cardiac arrest," and was pronounced dead twenty minutes after his arrival at the hospital. The following physical injuries were listed: "multiple abrasions and ecchymosis to [the] face, bilateral upper extremities, and back," which were in various stages of healing; ecchymosis in the "right scapular region"; "multiple contusions to mid forehead and bilateral temporal areas with raccoon eye"; swelling of the right eyelid; "copious bleeding from oral pharynx"; a two centimeter laceration

---

[3] While the police report stated that Michael's self-injurious behavior began on Wednesday, Albert testified that Cynthia reported the behavior as beginning on Monday.

10

through his bottom right lip; multiple chipped or loose teeth, and "[a]ctive blee[d]ing in the oral cavity." DCPP presented no evidence establishing when Michael sustained his various injuries, and through Williams' testimony the agency acknowledged it did not know at what point defendants should have sought medical care for Michael.

DCPP investigation records documented Williams' interview with Rick, four days after Michael's death. Rick, who also used a Creole interpreter, asserted Cynthia was not Michael's "babysitter" because she was not paid for her services and "she was only helping" because her niece could no longer watch him. He stated Cynthia began watching Michael in January 2021 for "short term" until Nadine was able to obtain another babysitter. Consistent with Cynthia's statement to the Prosecutor's Office detectives, Rick said he was unhappy with this arrangement.

According to Rick, Cynthia watched Michael Monday through Friday, and although Michael was supposed to go home every night, he sometimes stayed overnight. Rick's contact with Michael was limited because he worked during the week, from 3:30 p.m. until midnight. Rick also claimed that Nadine did not provide any food for Michael.

Rick said that on February 8, a week before Michael died, the child had some bruises on his body from falling off the bed at Rick's home. Rick did not

11

have more information about this incident other than saying Cynthia called Nadine and had asked her to pick up Michael earlier. However, Nadine did not come until two days later.

Rick claimed that Cynthia did not want to continue caring for Michael, but that Nadine "begged" her to watch him because she had no other help. Rick stated Nadine had dropped Michael off on Tuesday, February 13, and the following day, Cynthia told him "she did not like" how Michael "was acting," as he was "banging his head and throwing scratching his face [sic]." Rick advised Cynthia to contact Nadine, and Cynthia had a video call with her to show her Michael's behavior. Nadine reportedly responded that "she was already aware [of] this kind of behavior" and "she was not concerned about" it. Rick related that Nadine was supposed to pick him up that day, but she did not.

Rick was home on Thursday, February 18, and witnessed Michael "scratching his face and hitting his head." Rick said he sent Nadine a "voice note on WhatsApp" regarding Michael's behavior but Nadine did not respond. Before he left for work Friday morning, Rick told Cynthia to again call Nadine to pick up Michael. He was at work when Michael passed away.

When questioned about his children's reaction to Michael's death and their mother's incarceration, Rick said that James did not exhibit any behavioral changes but "was sad about not having his mother in the home and

12

about what happened." He said James sometimes helped look after his siblings but denied that James cared for Michael.

Williams also interviewed James, who was fourteen-years old at the time. James was sad about his mother and Michael, but denied having any behavioral issues, nightmares, or bedwetting following Michael's death and his mother's arrest. James said he never watched Michael, helped feed him, or changed his diapers. DCPP expressed a concern that James may have developmental delays, noting that he gave short, one-worded answers and spoke Creole, not English.

As part of its investigation, DCPP contacted defendants' children's medical providers, who did not report any concerns following Michael's death. The children's physical examinations were "unremarkable," but the Routine Diagnostic Treatment Center opined that James may "benefit from therapy to help process his experience relat[ed] to the death of [Michael]" and recommended an evaluation for any potential developmental delays.

Following its investigation, DCPP substantiated the allegations of medical neglect and inadequate supervision against defendants for Michael but found the physical abuse allegations "not established" and the inadequate supervision allegations against Nadine "unfounded." The agency also concluded that while defendants' children "were not found to be directly

abused and neglected, the parents['] failure to act on behalf of another minor child in their care placed their children at risk of harm," and that they "failed to appropriately plan for the care and well-being of their children" because they were excluded from their home after Cynthia's arrest. Thus, DCPP substantiated against defendants the allegation of their risk of harm to the children.

Family Court's Decision

On October 12, the family court issued an oral decision. The court initially determined defendants were Michael's legal guardians under N.J.S.A. 9:6-8.21(a). The court found defendants "took over babysitting" Michael after his parents stopped relying on Cynthia's niece. When Michael was with defendants, the court found, he was "one hundred percent dependent on [them] for everything a child that age needs; each and all aspects of shelter and food." Noting that Cynthia watched Michael for extended periods of time, including overnights, the court determined defendants were not merely engaging in "a brief or occasional caretaking function." Rather, the court found that during the week of February 15, Michael "was solely and exclusively in the care of [defendants]." While finding both defendants were responsible for Michael because they both saw Michael in medical distress and failed to intervene, the court's findings related primarily to Cynthia.

14

The court then found defendants abused or neglected Michael by causing him "actual harm"—a finding not specifically alleged by DCPP—concluding that his injuries could not have occurred absent abuse or neglect by defendants. The court also determined defendants abused or neglected Michael under N.J.S.A. 9:6-8.21(c)(4) due to their failure to provide him medical care, and that this "failure to exercise the minimum degree of care caused immediate danger or a substantial risk of harm to the child." The court next found defendants' failure to seek medical attention for Michael placed their children in imminent danger for substantial risk of harm.

That same day, the court entered an order on fact-finding reflecting its findings. The order stated defendants' "failure to seek proper medical attention for [Michael] clearly constitutes medical neglect" and "their failure to get [Michael] help also put [defendants'] three children at a risk of harm." The court also entered an order of disposition, continuing DCPP's care and supervision of defendants' children.[4]

II.

---

[4] The case remained open while DCPP assisted defendants with incidental educational and therapeutic issues for James. Once those issues were resolved, on March 9, 2022, a different family court dismissed the litigation, granted full custody of the children to Rick with no restrictions, and limited the incarcerated Cynthia to supervised contact only.

As noted, defendants raise separate and common contentions. Before addressing them, we briefly discuss some general principles governing a court's abuse or neglect findings and subsequent appellate review.

Given that "[a]buse and neglect cases 'are fact-sensitive,'" Dep't of Child. & Fams., Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180 (2015) (quoting Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 309 (2011)), appellate review affords deference to the family court's factual determinations because it makes "first-hand credibility judgments," N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). "This deferential standard of review is appropriate because the [family court is] presumed to have a 'specialized knowledge and experience in matters involving parental relationships and the best interests of children.'" N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 261 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012)). Accordingly, we only disturb the family court's factual findings that are "clearly mistaken" or "wide of the mark." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." N.J. Div. of Youth & Fam.

Servs. v. R.G., 217 N.J. 527, 552-53 (2014) (quoting Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995)).

After conducting a fact-finding hearing, a family court must determine by a preponderance of evidence considering "only competent, material and relevant [admissible] evidence" that a child is abused or neglected. N.J.S.A. 9:6-8.46(b)(2). Relevant here, an "[a]bused or neglected child" is one whose parent or guardian:

> (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; . . . (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [N.J.S.A. 9:6-8.21(c).]

"[E]vidence of actual impairment to the child will satisfy the statute, but in a case where there is no such proof, the critical focus is on evidence of imminent danger or substantial risk of harm."  N.J. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013).[5]  Proof of harm can come from any number of competent sources, including "medical and hospital records, health care providers, caregivers, or qualified experts."  Id. at 23.

### III.

We first address defendants' contention that the family court lacked jurisdiction to conduct the abuse or neglect hearing.  Because their arguments and the outcomes differ, we discuss them separately.

Jurisdiction Over Rick

Rick argues the court erred in qualifying him as Michael's guardian under N.J.S.A. 9:6-8.21(a) because he was neither Michael's babysitter nor

---

[5]  Following oral argument, we requested the parties to submit supplemental briefs addressing our recent Supreme Court's decision in N.J. Division of Child Protection & Permanency v. B.P., 257 N.J. 361, 366 (2024), which addressed the meaning of "imminent danger of becoming impaired" within N.J.S.A. 9:6-8.21(c)(4)(a). Upon review of B.P. and the parties' submissions, we do not find the decision impacts our reasoning as it relates to Michael, but briefly address this holding when reversing the court's findings on the biological children.

approved of the care arrangement for Michael. The Law Guardian supports his argument.

An allegation of child abuse or neglect under Title 9 "generally requires that the offender have a responsibility or legal duty to care for the child or protect the child's welfare." Fall & Romanowski, New Jersey Family Law: Child Custody, Protection & Support § 30:2-1(b) (2022-2023). N.J.S.A. 9:6-8.21(c) describes abuse or neglect as actions or inactions committed by a "parent or guardian." In pertinent part, a child's parent or custodian is defined as follows:

> "Parent", as used in this chapter, shall include the stepfather and stepmother and the adoptive or resource family parent. "The person having the care, custody and control of any child", as used in this chapter, shall mean any person who has assumed the care of a child, or any person with whom a child is living at the time the offense is committed, and shall include a teacher, employee or volunteer, whether compensated or uncompensated, of an institution . . . who is responsible for the child's welfare, and a person who legally or voluntarily assumes the care, custody, maintenance or support of the child.
>
> [N.J.S.A. 9:6-2]

A "parent or guardian" includes "any natural parent, adoptive parent, resource family parent, stepparent, paramour of a parent, or any person, who has assumed responsibility for the care, custody, or control of a child or upon whom there is a legal duty for such care." N.J.S.A. 9:6-8.21(a).

Consequently, a parent or guardian includes "those who have assumed a general and ongoing responsibility for the care of the child."  N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 220 (App. Div. 2019) (quoting State v. Galloway, 133 N.J. 631, 661 (1993)).  This "'general and ongoing responsibility' need not be based on a 'legal and formal' relationship with the child, and instead 'may arise from informal arrangements.'"  Ibid. (quoting Galloway, 133 N.J. at 661).  However, a distinction exists between a parent/guardian and someone who "assumes 'temporary, brief, or occasional caretaking functions, such as irregular or infrequent babysitting.'"  Ibid. (quoting Galloway, 133 N.J. at 661-62).

Based on our review of the record, we are constrained to conclude the family court's finding that Rick's relationship with Michael rose to the level of a guardian under Title 9 is factually and legally unsupported.  The preponderance of evidence does not support the court's finding that Rick was Michael's guardian under N.J.S.A. 9:6-2 and N.J.S.A. 9:6-8.21 because he "took over babysitting" Michael with his wife.

The hearing testimony and admitted documents demonstrate it was Cynthia who cared for Michael both day and night.  Despite finding that both defendants were responsible for Michael, the court's findings primarily related to Cynthia.  Significantly, there was no testimony that Rick fulfilled any

caregiving responsibilities for Michael, such as feeding him, changing his diapers, bathing him, or watching him. Rick did not arrange for babysitting Michael, initially was unaware of the arrangement, and then opposed it when it came to his attention. There was no evidence that Rick cared for Michael during the week of his death, and his work schedule placed him out of the home from approximately 1:00 p.m. until midnight. At most, Rick told DCPP that he observed Michael's tantrums on one occasion, prompting him to notify the child's parents.

There is no merit to DCPP's arguments that Rick's minor involvement with Michael—such as purchasing groceries for the household, complying with Cynthia's request to look at Michael's mouth, or asking Michael's parents to pick Michael up—rendered him the child's guardian. Rick's contacts with Michael should not be conflated as exercising a caretaking role. The record does not support the family court's determination that Rick was Michael's guardian because he "took over babysitting" Michael with his wife.

We find support in two of our prior decisions. In B.H., the mother asked her boyfriend, the defendant, to take her child to a fast-food restaurant while she ran an errand. 460 N.J. Super. at 215. While driving under the influence, the defendant got into a single-car accident. Ibid. We concluded the defendant was not a parent or guardian under Title 9 because he "did not

assume a general and ongoing responsibility for regular supervision or care" for the child, given that, at most, he had supervised the child himself on two "limited occasions." Id. at 221. Likewise, there is no evidence that Rick had any individual interactions with Michael during which he was responsible for the child, let alone where he assumed a general and continuing responsibility for Michael.

In State v. Still, we rejected the trial court's sentencing determination that the defendant had a parental duty for the victim under the child endangerment statute merely because he was the child's babysitter's grandson.[6] 257 N.J. Super. 255, 259-60 (App. Div. 1992). We concluded "the defendant was not a parent and was not even the baby[]sitter herself, and no legal duty is asserted to have been owed by him to the victim." Ibid. Similarly, Rick's marriage to and co-habitation with Cynthia—Michael's dedicated babysitter—does not transpose a caregiver responsibility over Michael, especially given his minimal involvement with Michael.

Because we conclude that Rick was not Michael's guardian during the child's stay at Rick's home, the family court lacked jurisdiction under Title 9 to

---

[6] Because the duty to care for a child under "the language in Title 9" is comparable to "the related context of criminal child endangerment," B.H., 460 N.J. Super. at 220 (citing N.J.S.A. 2C:24-4(a)), it is logical to consider a criminal case to assess who qualifies as a caregiver.

consider that Rick abused or neglected Michael. Consequently, we need not address his and the Law Guardian's other arguments that there was insufficient evidence to support a finding against him for the abuse or neglect of Michael.

Jurisdiction Over Cynthia

Cynthia argues the family court erred in finding she was Michael's guardian under N.J.S.A. 9:6-2 because she was not paid to care for him, she reluctantly agreed to watch him to assist his family, and she repeatedly asked his parents to take him home. She also argues the court lacked jurisdiction to determine she abused or neglected Michael because he was not named in the complaint. Unlike our conclusion as to Rick, we find the family court had jurisdiction over the complaint against Cynthia.

The record supports the family court's finding that Cynthia watched Michael for extended periods of time, including overnights, and that she was not merely engaging in "a brief or occasional caretaking function," during the week of Michael's death, including the ill-fated day he died. It is insignificant that she was not compensated for caring for Michael or was a reluctant babysitter who sought to end the babysitting session earlier. The preponderance of evidence established that Cynthia assumed "the kind of ongoing and continuous caretaking or supervisory responsibilities" to render her Michael's caregiver. Galloway, 133 N.J. at 662.

As to the argument related to DCPP's failure to name Michael in the complaint, she failed to raise this argument before the family court.[7] Normally, we would not consider the argument. See Neider v. Royal Indem. Ins. Co., 62 N.J. 229, 234-35 (1973). Because the issue was not raised below, the plain error rule provides that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. If there is a due process violation, a new trial may be required unless the reviewing court finds that "the constitutional violation was harmless beyond a reasonable doubt." State v. Jones, 224 N.J. 70, 85 (2016). We conclude no unjust result occurred by not specifying in the complaint that Michael was abused or neglected.

"A complaint . . . is not required to spell out the legal theory upon which it is based." Farese v. McGarry, 237 N.J. Super. 385, 390 (App. Div. 1989). "Its necessary contents are only 'a statement of the facts on which the claim is based, showing that the pleader is entitled to relief, and a demand for judgment for the relief to which he deems himself entitled.'" Ibid. (quoting R. 4:5-2).

---

[7] Rick raised the same argument on appeal, but also failed to argue it before the family court. As noted, because we conclude Rick was not Michael's guardian resulting in the court's lack of jurisdiction, we do not address his other arguments.

"[M]inimum[] 'due process requires that a parent charged with abuse or neglect have adequate notice and opportunity to prepare and respond.'" N.J. Div. of Youth & Fam. Servs. v. P.C., 439 N.J. Super. 404, 412 (App. Div. 2015) (quoting N.J. Div. of Youth & Fam. Serv. v. T.S., 429 N.J. Super. 202, 213 (App. Div. 2013)). "There can be no adequate preparation [for trial] where the notice does not reasonably apprise the party of the charges, or where the issues litigated at the hearing differ substantially from those outlined in the notice." N.J. Div. of Youth & Fam. Serv. v. B.M., 413 N.J. Super. 118, 127 (App. Div. 2010) (alteration in original) (quoting H.E.S. v. J.C.S., 175 N.J. 309, 322 (2003)). Because "[t]he fact-finding hearing is a critical element of the abuse and neglect process," it "must be conducted 'with scrupulous adherence to procedural safeguards.'" P.C., 439 N.J. Super. at 413 (first quoting N.J. Div. of Youth & Fam. Servs. v. R.M., 411 N.J. Super. 467, 474-75 (App. Div. 2010); and then quoting N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 401 (2009)).

Michael's death triggered a DCPP investigation against Cynthia for her purported abuse or neglect of Michael. While the investigation was pending, DCPP filed a complaint against her for the care and supervision of her own children. The complaint detailed the circumstances of Michael's death, and the ensuing investigation related to her biological children. Although the

25

complaint did not name Michael as a subject child, nor did it seek a finding against Cynthia on his behalf, she was on fair notice that the allegations related to her children derived from Michael's death. And from the record, because the litigation centered on Michael's behavior, defendant's conduct, and his death, it does not appear she was prejudiced in any way by DCPP's initial inattentiveness in not pleading that Michael was abused or neglected by defendants.

IV.

We next address Cynthia's contention that the family court erred in finding there was sufficient evidence that she abused or neglected Michael, and in doing so, violated her due process rights.[8] She maintains she appropriately cared for Michael by contacting his parents, documenting his behavior, and, through her cousin, seeking emergency services when he injured himself.

Preliminarily, Cynthia contends that the court's finding of actual harm constituted an erroneous sua sponte finding of physical abuse. The court's oral decision did not articulate whether its finding of actual harm to Michael was

---

[8] Rick and the Law Guardian, on his behalf, raise similar contentions. As noted, because we conclude the family court lacked jurisdiction over Rick, we do not address their other arguments. That said, the same reasoning we apply to Cynthia's insufficient evidence arguments would also apply to Rick.

based on defendant's physical abuse of the child, N.J.S.A. 9:6-8.21(c)(1), or medical neglect resulting in actual harm or imminent risk of harm, N.J.S.A. 9:6-8.21(c)(4). Yet, the decision and the fact-finding order make no mention of physical abuse, and clearly reflects the court's finding that defendant's medical neglect of Michael caused him both actual harm and placed him at imminent risk of harm. To the extent that the court's decision is unclear, there is otherwise sufficient information in the record from which to assess whether Cynthia's actions or inactions caused Michael actual harm or placed him at imminent risk of harm. N.J. Div. of Child Prot. & Permanency v. Y.A., 437 N.J. Super. 541, 546 (App. Div. 2014) (citing F.M., 211 N.J. at 448-49). With this as a backdrop, we conclude there was insufficient evidence that Cynthia abused or neglected Michael.

"[E]vidence of actual impairment to the child will satisfy [N.J.S.A. 9:6-8.21(c)(4)], but in a case where there is no such proof, the critical focus is on evidence of imminent danger or substantial risk of harm." A.L., 213 N.J. at 22. Proof of harm can come from any number of competent sources, including "medical and hospital records, health care providers, caregivers, or qualified experts." Id. at 23. The court's findings here are intertwined, as it apparently relied on the same evidence to determine both actual harm and imminent risk of harm.

27                                            A-2521-21

The court relied on N.J.S.A. 9:6-8.46(a)(2) to determine that Cynthia's actions or inactions resulted in "actual harm" to Michael. The statute states:

> [P]roof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian shall be prima facie evidence that a child of, or who is the responsibility of such person is an abused or neglected child[.]

"[P]rima facie evidence [is] [e]vidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 370 (2021) (alterations in original) (quoting Black's Law Dictionary 701 (11th ed. 2019)). However, establishing a prima facie case of abuse does not automatically establish culpability. Rather, DCPP maintains the burden of proving the abuse or neglect by a preponderance of the evidence. Id. at 359 (citing N.J.S.A. 9:6-8.46(b)(1)). Where there is prima facie evidence of abuse or neglect, pursuant to the traditional doctrine of res ipsa loquitur, a factfinder can then draw an inference of abuse or neglect unless there is evidence to the contrary. Id. at 370-71.

In this case, the family court's finding of actual harm was based on the nature of Michael's injuries and his death. Indeed, a child's sudden death and accompanying physical injuries may support a prima facie finding of abuse or neglect. See Div. of Youth & Fam. Servs. v. Robert M., 347 N.J. Super. 44,

66-67 (App. Div. 2002) (recognizing the trial court's prima facie finding of neglect against the parents of their deceased adopted child, where a doctor testified about the extent of the child's injuries, opined that the parents' claim that the injuries were self-inflicted were unfounded, and concluded that the parents' failure to seek medical attention for the child's various injuries and behavioral issues constituted medical neglect). There is no question that Michael sustained multiple injuries. However, the court's finding that his injuries constituted prima facie proof of abuse or that Cynthia's actions or inactions resulted in his actual harm or placed him at imminent risk harm was unsupported in the record and contrary to DCPP's case.

It appears the court found that because Michael presented with numerous physical injuries and then went into cardiac arrest and died, Cynthia was neglectful in caring for him—either allowing him to sustain physical injuries or failing to protect him from the risk of injury. However, "[t]he record contains no expert evidence or even admissible documentary evidence supporting" this conclusion. N.J. Div. of Youth & Fam. Servs. v. S.I., 437 N.J. Super. 142, 157 (App. Div. 2014). Expert testimony is not required in abuse or neglect cases when "an adequate presentation of actual harm or imminent danger can be made without the use of experts." A.L., 213 N.J. at 29.

29

Nevertheless, when "the evidence presented does not demonstrate actual or imminent harm, expert testimony may be helpful." Id. at 28.

Thus, while not required, DCPP often presents expert testimony to support a prima facie finding of abuse or neglect based on a child's physical injuries. See, e.g., Robert M., 347 N.J. Super. at 50-51 (finding by trial court of a prima facie case of medical neglect, where a doctor testified about the scope of the child's injuries, that they did not appear self-inflicted, and that the parents' failure to obtain medical care contributed to the child's death); N.J. Div. of Youth & Fam. Serv. v. N.S., 412 N.J. Super. 593, 611, 625 (App. Div. 2010) (affirming determination that child's injuries were prima facie evidence of abuse, where a doctor testified about child's "blunt force trauma" to his stomach, and said it was "consistent with being punched by an adult" and there was no plausible accident that could have caused the injury); Div. of Youth & Fam. Servs. v. J.L., 400 N.J. Super. 454, 459-61, 470-71, 473 (App. Div. 2008) (holding where there was a prima facie case of child abuse based on infant's multiple leg fractures and expert testimony that the injuries appeared "'highly suspicious' of child abuse," the trial court correctly determined defendants had "overcome" "the inference of abuse" due to their expert testimony about the fragility of the bones and how the child's fractures could be the result of accidental injury); N.J. Div. of Youth & Fam. Serv. v. A.C., 389 N.J. Super.

30

97, 102-03, 109 (Ch. Div. 2006) (affirming finding of neglect where child's skull fractures constituted prima facie proof of abuse or neglect, where an expert testified about the extent, nature, and effect of the injury, and opined that the injury was not consistent with the proffered explanation).

DCPP did not present expert testimony here, despite the lack of clarity surrounding the circumstances of Michael's various injuries and death. Defendants reported that during his five-day stay at their home, Michael engaged in tantrums, scratched himself, and banged his body on the floor. However, their statements did not note any injury from these behaviors prior to Friday, the day Michael died. At the hospital, Michael exhibited contusions on his forehead, scalp swelling, lacerations on his lip, scratches and bruises on his body, a "raccoon eye," and shattered teeth. However, it is unclear which, if any, of these injuries were sustained prior to that day.

When these injuries were sustained is critical. DCPP requested a finding of medical neglect based on defendants' failure to obtain medical care for Michael prior to the day he passed. The testimony indicated that Cynthia had acted appropriately on the day of Michael's death, when she wrapped his head and immediately sought emergency care for him. The court, however, did not clearly articulate whether it also limited its findings to defendants' conduct before that fateful day. Based on DCPP's concession, however, the assumption

31

is that if Cynthia had adequately responded to Michael's medical needs on Friday, then defendants' medical neglect must have occurred prior to that date.

Importantly, the evidence is inconclusive as to whether Michael required medical care prior to Friday, rendering defendants' neglectful under N.J.S.A. 9:6-8.21(c)(4) for failure to obtain immediate medical care for him. While Michael presented with extensive physical injuries on Friday, there is no conclusive evidence as to when he sustained those injuries, including whether he sustained those injuries prior to Friday. According to defendant's statements—which DCPP did not dispute—prior to Friday, Michael's tantrums resulted in no demonstrable injury. Given the lack of evidence of earlier physical injury, it is unclear whether defendants could have anticipated that Michael's tantrums would have placed him at imminent risk of harm. Indeed, DCPP could not identify when defendants should have sought medical care, prior to Friday. Thus, despite Michael's behavioral issues and some self-harming behavior, there is no evidence that this resulted in any physical injuries, let alone injuries that required immediate medical attention.

Moreover, DCPP's evidence did not establish what caused Michael's death, or whether any earlier-inflicted injuries contributed to his death. There was no expert testimony interpreting Michael's medical records, opining as to when he sustained his injuries, identifying which injuries would have required

prompt medical attention, identifying which injuries contributed to his death, and/or stating what caused Michael to go into cardiac arrest to which he succumbed.

Thus, evidence is lacking that Cynthia's conduct caused Michael actual harm, or that her failure to better address Michael's tantrums placed him at imminent risk of harm. Without evidence as to when Michael sustained his various injuries, whether his earlier tantrums resulted in any demonstrable injury, or any evidence to otherwise indicate that defendants should have sought medical care for Michael earlier, there is nothing in the record to find that Cynthia's actions or inactions were likely to cause Michael's injury or that Michael's tantrums constituted a "dangerous risk[]" with "potentially serious consequences" reasonably necessitating intervention. G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 179 (1999) (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)).

In fact, Cynthia, as well as Rick, appropriately responded to Michael's tantrums by repeatedly contacting his parents and recording his behavior for them. Cynthia testified how she minimized opportunities for Michael to hurt himself by having him sleep on the floor and asking her teenage son to keep an eye on him while she used bathroom. We discern nothing unreasonable about

her conduct. There is insufficient evidence that Cynthia placed Michael at imminent risk of harm.

<div align="center">V.</div>

Finally, we address Cynthia's argument that the family court erred in relying on her purported abuse of Michael to sustain its finding that she abused or neglected her own children. She maintains her purported conduct towards Michael was not properly introduced as other crimes evidence to prove she abused or neglected her children. Given our conclusion there was insufficient evidence that she abused or neglected Michael, we in turn conclude there is insufficient evidence she abused or neglected her children.[9] For the sake of completeness, however, we consider Cynthia's contention.

Under Title 9, "proof of the abuse or neglect of one child shall be admissible evidence on the issue of the abuse or neglect of any other child of, or the responsibility of, the parent or guardian." N.J.S.A. 9:6-8.46(a)(1). A family court therefore "need not wait to act until a child is actually irreparably

---

[9] As noted, we conclude the family court lacked jurisdiction under Title 9 to consider that Rick abused or neglected Michael. By extension, the court also lacked jurisdiction to consider whether Rick abused or neglected his own children, as this allegation was based on his purported inadequate supervision of Michael. That said, the same reasoning we apply to Cynthia's insufficient evidence arguments would also apply to Rick.

<div align="center">34</div>

impaired by parental inattention or neglect." In re Guardianship of DMH, 161 N.J. 365, 383 (1999).

In fact, in Robert M. we held that "[a]lthough the absence of past physical abuse to [defendants'] natural children may infer their future safety, the alleged treatment of [the adopted child] could be a dangerous harbinger to one or more of the others." 347 N.J. Super. at 68. Therefore, "[i]f [the adopted child] was abused by defendants and died as a result, potential abuse of other children, whether emotional or physical, cannot be discounted." Ibid. Even so, there "must still [be] a preponderance of the competent, material and relevant evidence [of] the probability of present or future harm." N.J. Div. of Youth & Fam. Servs. v. S.S., 372 N.J. Super. 13, 24 (App. Div. 2004) (internal citation omitted).

As to Cynthia's argument that the family court abused its discretion in admitting other crimes evidence to sustain the charges against her, it is without merit. See N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (recognizing we only reverse a trial court's admission of evidence if there is an "abuse of discretion" (quoting N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super, 478, 492 (App. Div. 2016))). Her reliance on N.J.R.E. 404(b) and State v. Cofield, 127 N.J. 328 (1992), is misplaced. N.J.R.E. 404(b)(2) provides that evidence of a person's

other crimes is not admissible to provide propensity but can be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Cofield's four factors are considered to assist a trial court in determining whether evidence of the prior crime is admissible under N.J.R.E. 404(b). State v. Carlucci, 217 N.J. 129, 140 (2014). Cynthia's purported wrongful conduct was the basis for DCPP's allegations against her; it was not an additional prior bad act that DCPP sought to use against her.

On the other hand, we agree with Cynthia that there is insufficient evidence to support the family court's finding that, assuming it correctly found she abused or neglected Michael by not seeking medical care for him, there is insufficient evidence that the inaction placed her children at imminent risk of harm. Cynthia's relationship with Michael is vastly different than with her children. DCPP provided no proof she had medical decision-making authority for Michael or was aware of his pediatric or health insurance information, as she would have for her children. Nevertheless, she took immediate action when presented with a true medical emergency on the day Michael died. DCPP has not shown that Cynthia's reaction to Michael's behavior established her children's future medical needs would go unattended. See N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 615-16 (App. Div. 2007)

A-2521-21

(concluding in a termination proceeding, the parents' abuse or neglect of one child did not support a finding of abuse or neglect of the other children, as there was no evidence that the other children were abused or neglected, and the risk of future harm was limited, noting there was no "consistent pattern of egregious acts of abuse or neglect").

To a support a finding of abuse or neglect based on imminent risk of harm, "the mere possibility of the child being impaired" is not sufficient. B.P., 257 N.J. at 379. In this case, the threat of harm to Cynthia's children was speculative, as there otherwise was no evidence of any harm to them, and the circumstances surrounding Michael's death were too nuanced to demonstrate a finding of imminent harm to her children.

Reversed and remanded for the family court to remove defendants' names from the Central Registry maintained by the DCPP under N.J.S.A. 9:6-8.11.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2521-21